THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. WILLIAM JOHN STEPHAN, PLAINTIFF IN ERROR.

Argued February 4, 1937; Reargued May 25, 1937—Decided September 22, 1937.

For the plaintiff in error, *John L. Morrissey* (*E. George Aaron*, of counsel).

For the state, *Samuel P. Orlando*, prosecutor of the Pleas.

The opinion of the court was delivered by

PARKER, J. The plaintiff in error was indicted by the grand jury of Camden county for the murder of Curtis W. Dobbins, and was convicted of murder in the first degree without recommendation of life imprisonment. The case is before us on strict writ of error, and was argued as though here also under section 136 of the Criminal Procedure act. But there is no certificate by the trial court of "the entire proceedings had upon the trial" of the cause, as required by our decisions. The formal return of the record on writ of error does not

suffice. See, for example, *State* v. *Clark,* 75 *N. J. L.* 473, citing prior cases; *State* v. *Webber,* 77 *Id.* 580; *State* v. *Timmerari,* 96 *Id.* 442, and *State* v. *Mason,* 113 *Id.* 364, where other cases are cited. The review is therefore limited to matters available on strict writ of error.

For reasons that will presently appear, a conviction of murder in the second degree would be supported by the evidence conceded to have been properly admitted at the trial. But the state pressed for, and the jury returned, a verdict of murder in the first degree, on the theory that the killing was done "in perpetrating or attempting to perpetrate" a robbery. Crimes act, section 107; *Comp. Stat.* 1910, *p.* 1780. Much of the argument is devoted to the evidence on this point, and the propriety of its admission. Weight of evidence is not argued, and indeed is not available on strict writ of error.

The state's theory of the homicide was that defendant, armed with his own revolver, rang the doorbell of Dobbins' house at about ten-forty-five P. M. of August 11th, 1936; that Dobbins went to the door and opened it, to confront defendant standing with an aimed revolver, and saying "stick 'em up;" that Dobbins attempted to escape or dodge, and defendant shot three times, one bullet taking effect in the body of Dobbins, who was nevertheless able before collapsing to telephone to the police, who hastened to the scene, arriving in about five minutes after the shooting, and were told by Dobbins what had happened; that Dobbins was taken to the hospital and died early in the morning of August 17th. At the hospital he made a statement a few hours before his death to the attending physician, as to the circumstances of the shooting. This statement was admitted by the court over objection and exception, as a dying declaration; and statements of deceased to the police at the house after the shooting and on the way to the hospital were similarly admitted, on the theory of *res gestæ.* Both rulings are claimed to be erroneous.

The fact of the shooting, and that it was by the defendant, was adequately, though circumstantially, proved without

necessity of resort to any statement by the deceased by way of confession. It appeared that defendant, who lived in Camden and worked in Philadelphia, had an automobile, the license plates of which were changed after the shooting; that prior to the shooting he had been heard to say that he had pulled off small jobs and they had not caught him and there was a certain place in Haddonfield that he was going to pull; that on another occasion one of his young woman friends had expressed in his presence a wish for a fur coat, and that defendant had said in substance that it was easy, a couple of steel slugs would do it, all that was needed was to go into a store and tell them to "stick them up," and so on; that he was out with the car that evening in New Jersey, ostensibly "selling sheets" for his employer; that he had a woman with him, who testified at the trial; that they stopped at various drinking places and at a brickyard, and finally in a side road, near the house where Dobbins was shot, identified by this woman witness from the picture in the newspaper and again on the ground after the murder; that she fell asleep and was wakened by a noise like a backfire and the slamming of a door (at another place the witness said "or" instead of "and"); that defendant was in the car alongside her and she told him to get started as it was late; that they went to a diner, where a police officer looked at them queerly; then over the ferry to Philadelphia. The revolver was found in a stove at defendant's lodgings, and when found was empty. Defendant admitted to the prosecutor of the Pleas that the revolver was his, that he must have fired it but remembered nothing about doing so. Expert testimony indicated that the bullet that wounded deceased, and the two other bullets found in his house, were fired from that revolver. The jury were therefore fully justified in finding that the defendant did the killing; and such killing was presumptively murder (*State* v. *Silverio,* 79 *N. J. L.* 482); but without more, murder in the second degree. *Brown* v. *State,* 62 *Id.* 666. The trial court so charged. To support a conviction of murder in the first degree, it was incumbent on the state to show by legal evidence, either that the killing was willful, delib-

erate and premeditated, which there was no attempt to show, except incidentally as above; or that it occurred in the perpetration of, or attempt to perpetrate, one or more of the other crimes mentioned in section 107 of the Crimes act, *supra;* in this case, robbery. See *State* v. *Hauptmann,* 115 *N. J. L.* 412. It was to this latter that the *"res gestæ"* and "dying declaration" testimony was pertinent; and it is to this testimony that the principal argument is directed.

Taking up the matter of the "dying declaration" first: Dr. Davis, the attending physician at the hospital, testified that at the time of the statement, the condition of the patient was "very poor." "*Q.* Did he say anything which would indicate knowledge on his part? *A.* Yes, we had given him a transfusion and he said, 'Stan, I don't think I am going to make it,' he said, 'I feel myself getting weaker,' and of course, we didn't tell him that he was, but we told him that he was all right, we were going to give him another transfusion Monday, just so he wouldn't think that he was going to die, although he did tell us that he thought he would die. *Q.* When did he tell you that, before or after the transfusion? *A.* After. *Q.* About that time did you have any conversation with him in which he stated what had happened?" (Objected to as not within the rule; the court opined that it was, but permitted cross-examination, which was as follows): "By Mr. Morrissey: *Q.* You say he talked to you concerning his condition prior to making any statement, is that true? *A.* Yes. *Q.* What did he say concerning his own physical condition? *A.* He said, 'I feel myself getting weaker and I don't think I am going to make it.' *Q.* Did he say that he knew he was going to die? *A.* He felt that he was going to die. *Q.* He wasn't certain of it, was he? *A.* Yes, he seemed to be pretty sure. *Q.* Did you try to cheer him up about it? *A.* Yes, it didn't seem to work. *Q.* What did you say to him? *A.* I said, 'oh, don't worry about that, Curt; you always have a few rough days before you get well,' but it didn't console him much. *Q.* What answer did he give you about that? *A.* He said, 'well, I still think I am getting weaker.' *Q.* He said he thought he was getting weaker? *A.* Yes. *Q.* After

that did you again talk to him about his condition before he made this statement? *A*. After what? *Q*. After he had said he thought he was getting weaker? *A*. Yes.

"By the court: *Q*. How long after that was it before he made the statement, doctor? *A*. How long after he told me that, judge? *Q*. Yes, was it a matter of minutes or hours? *A*. Oh, no, it was all within two or three minutes. *Q*. Then he died how long after that time? *A*. He didn't die until the next morning.

"By Mr. Morrissey: *Q*. And he told you that he thought he was getting weaker? *A*. Yes. *Q*. Mr. Morrissey: Is that the idea? Now, if your honor please, I repeat my objection. I think the law is very clear that in dying declarations the party making the statement must be certain that they are about to die, and the fact that they think in their minds they are about to die has no influence.

"The court: The test is all hope of life. I think the elements are present, Mr. Morrissey, it seems to me your cross-examination merely confirmed what the doctor had already stated to be the fact.

"Mr. Morrissey: I think in cross-examination—the doctor said on direct examination that Mr. Dobbins thought he was getting weaker, which certainly is not a declaration of his intention of abandoning all hope.

"The court: Your objection is overruled. I will allow the testimony to go in as the dying declaration of the deceased."

(Exception sealed for defendant.)

The printed case does not show clearly who asked the next questions, but probably they were asked either by the prosecutor or by the court:

"*Q*. Let me ask you this, doctor, in order that there may be no question about it. You feel, in your opinion as a physician, that at the time when Curtis Dobbins was speaking to you and telling you he did not think he was going to make it, that he felt he was going to die? *A*. Yes. *Q*. Do you feel that he had given up hopes of living? *A*. I do.

"The prosecutor: Now I press the question. The court: You may.

"By Mr. Morrissey: Q. That is only your opinion? A. Well, it could not be anyone else's. The prosecutor: Will you repeat that previous question?

"By the court: Q. In your opinion, it is confirmed by the answers he gave to your questions? A. Yes, sir. The court: All right.

"The prosecutor: Now, will you repeat the previous question? (the following question was repeated: Q. At that time did you have any conversation with him in which he stated what had happened?) The court: You may answer that question, Dr. Davis. A. Yes. (No objection at this point.)

"By the prosecutor: Q. What did he say had happened? A. I again asked him what happened the night he was shot. Q. Tell us in your own words, the best you can recall, then what he said. A. He told me he was sitting in the living room, he heard someone coming up on the porch and rang the doorbell, he went to the door and he was greeted with the statement, 'stick them up!' He said then, 'I jumped aside and was shot, he shot at me three times.'"

The doctor testified further that defendant was brought before deceased at the hospital accompanied by others, for identification, and that deceased said he could not identify anyone. So it is worthy of note that the "declaration" (as will appear concerning the *"res gestæ"*) was purely impersonal and confined to the circumstances of the shooting, without reference to identity of the perpetrator.

It might well be said that the failure of counsel for the prisoner to renew his objection after the cross-examination and the repetition of the original question, which up to that time had not been answered, leaves the present argument without procedural support. But nothwithstanding this, we deem it well to go into the merits of the matter.

The rule of dying declarations seems to be more liberal in some jurisdictions than in others, but it is unnecessary to rely on outside cases, as the authorities in this state are numerous. In 1857 the leading case of Donnelly *v.* State was decided, first in the Supreme Court (26 *N. J. L.* 463)

and again in this court (*Id., p.* 601) where Mr. Justice Ogden said in part (at *p.* 618) : "But before such statements can be admitted as evidence, it must clearly appear to the court that at the time of his making them, the declarant was under the sense of impending death. For proof of that state of mind and consciousness, the court may look to the nature of the injury, the extent of the wound, the condition of the declarant, the notice (if any) given by physicians to him that certain dissolution will follow from the injury, his own expressions of his sense of his peril, and such other facts and circumstances as naturally would tend to show whether he had an abiding impression of almost immediate dissolution. It is this impression upon the mind, and not the fact of the quick succession of death after the declarations, that makes the testimony admissible before a jury.

"In such cases, the question before the court always is, whether the deceased, at the time of making his statements, was so conscious of his approaching death that the nearness of his end was calculated to lay upon him as strong an obligation to speak the truth, as is imposed by an oath in a court of justice." \* \* \* And (at *p.* 619) :

"The question thus preliminarily raised before the court did not affect the weight of the testimony, it simply involved its legal admissibility."

Counsel for defendant, in his brief, lays much stress on the decision of the Supreme Court in *Peak* v. *State,* 50 *N. J. L.* 179, in which the prevailing opinion was written by the late Chief Justice Beasley. But it is to be observed, first, that the case was not in this court; secondly, that the reversal turned primarily on irregularity in selecting the jury, as to which the court was unanimous, and only secondarily, on the dying declarations point, as to which we have the dissenting opinion of Mr. Justice Dixon (beginning at page 230) ; and finally, that in *State* v. *Monich,* 74 *Id.* 522, this court expressly overruled the views of Chief Justice Beasley in the Peak case, and adopted those of Mr. Justice Dixon, adding, in effect, that if there is any legal evidence to support the finding of the trial court that (in the language of State *v.*

Donnelly) "the declarations were in point of fact made under a sense of impending death, in view and expectation of the immediate approach of that solemn event," the admission of them is not reviewable by ordinary writ of error. That rule was recognized by this court in the later cases of *State* v. *Tomassi*, 75 *Id.* 739 (at *p.* 744), and *State* v. *Bovino*, 89 *Id.* 586, both of which came here with a "certificate of the entire record" under section 136 as well, and in both it was held that the preliminary evidence was sufficient without resort to the strict rule. We consider that the testimony on this point in the present case, most of which is quoted above, sufficiently supports the finding of the trial judge that the statement in question was made under the sense of impending death, and was therefore admissible as evidence.

We pass to the matter of *res gestæ*. This is argued under the seventh and ninth assignments of error. The seventh is based on a question to officer Githens, one of the policemen who responded to the telephone call, directing him to "describe what he found when he entered the Dobbins' house," with respect to lights, chairs, furniture, &c. The answer, without objection except as presently to be noted, began with the front door and lights, and went on to state that witness found Dobbins in the living room.

"On the davenport laid Curtis Dobbins and I said, 'Curt, what's the matter?' He said, 'I have been shot.' I said, 'what?' He said, 'yes, my God, I have been shot.' I said, 'did you see who did it?' He said, 'no, it happened too quick.' I said, 'you positively don't know who did it?' He said, 'well, Harry, it happened so quick all I could see was a dark-haired fellow.' And he said, 'please get me to the doctor or get me somewheres.' "

At this point the witness seems to have paused; and so far there had been no objection of any kind. The prosecutor then asked whether Dobbins said anything else at that time as to how it happened; whereupon counsel for the prisoner said: "If your honor please, I object to any testimony and ask that it be stricken, conversation with [*sic*] Dobbins with the police officer." The court would have been fully justified

in overruling the objection as too late (*State* v. *Fiore,* 93 *N. J. L.* 362), but there was a colloquy, in which the prosecutor pointed out that according to the testimony the shooting was at ten-forty-five, the telephone call at ten-forty-six, and within three or four minutes they * * * entered the property, * * * and nothing intervened which would give rise to any change or any deliberate plan on the part of the decedent," &c. The court ruled the testimony to be competent and allowed an exception. It is not clear whether the ruling related to the former answer, or to the new question whether anything else was said. The prosecutor evidently understood it to be the latter, for he continued, "will you repeat the question?" The question was repeated, and the witness replied that nothing else was said on that point. Allowance of that question was therefore not harmful.

After a short recess, Githens was asked by the prosecutor whether he had omitted anything, and answered that he had asked Dobbins if he had identified the person that shot him, and he said, "no, Harry, it happened so quick," he said, "I went to the door and he said 'stick them up,' and he began shooting instantly and I did not have a chance to see, only I could see a dark head." This was admitted over exception, but we cannot find that it is assigned for error. But on the pure merits it is to be tested by the same rules as what Githens was permitted to say before the recess. It may be noted also that it is merely cumulative of the statement admitted under the dying declarations rule.

The ninth assignment challenges the admission over exception of the testimony of officer Meader who accompanied Githens, and helped him support Dobbins out to the police car. Meader said this was approximately five minutes from the time of the telephone call. His account of what Dobbins said while being helped out of the house, agrees with Githens' testimony of what was said to him in the house. Treating No. 7 as based on a timely and proper objection, Nos. 7 and 9 may be considered together.

So far as the rule of *res gestæ* can be specifically stated, we find it several times in the decisions of this court and of the Supreme Court. In *Murphy* v. *George Brown & Co.,* 91

*N. J. L.* 412, a decision of the Supreme Court, it is thus phrased:

"*Res gestæ* includes those circumstances which are the undesigned incidents of a particular litigated act. They may be separated from the act by a lapse of time more or less appreciable and may consist of speeches of anyone concerned, whether participant or bystander. They may comprise things left undone as well as things done. They must be the necessary incidents of the litigated act in this sense that they are part of the immediate preparations for or emanations of such act, and are not produced by the calculated policy of the actors." The same phraseology was employed by this court in *State* v. *Doro,* 103 *N. J. L.* 88 (at *p.* 93), in a case where the spectator of a homicide started a hue and cry; and in *Hannaford* v. *Central Railroad Company of New Jersey,* 115 *Id.* 573 (at *p.* 575), in the Supreme Court, affirmed on the opinion of that court in 116 *Id.* 412. In the early and leading case of *Hunter* v. *State,* 40 *Id.* 495, Chief Justice Beasley (at *p.* 539), quoted with apparent approval the language of Lord Denman in *Rouch* v. *Great Western Railway Co.,* 1 *Q. B.* 60, as follows: "The principle of admission is, that the declarations are *pars rei gestæ,* and therefore it has been contended that they must be contemporaneous with it; but this has been decided not to be necessary, on good grounds; for the nature and strength of the connection with the act are the material things to be looked to; and, although concurrence of time cannot but be always material evidence to show the connection, yet it is by no means essential." Tested by these decisions, and in view of the fact that there was no break in the chain of events from the firing of the shot to the act of helping the stricken man out of the house some five or six minutes later, we think the trial judge properly held that the statement of Dobbins was, to quote Professor Wharton, part of the immediate * * * emanations of the act, and not produced by the calculated policy of the actors. 40 *Id.* (at *p.* 538.) The brief for plaintiff in error cites none of these cases, nor, indeed, any case except *Estell* v. *State,* 51 *Id.* 182, in the Supreme Court, which we do not find cited or discussed in any later case except *State* v. *Schuck,* 96 *Id.*

154, where this court held that the spending of money lavishly by robbers after a murder and robbery was no part of the *res gestæ,* but provable as a circumstance.

In the Estell case the statements were made some fifteen or twenty minutes after the injury. Without stopping to consider whether this difference in time is material, we are of the opinion that the Estell case (not binding on this court) is somewhat out of step with the other cases discussed above.

The other points do not require any lengthy discussion. We see no error in the matter of selecting the jury. It is well settled in this state that the fact that a juror has a pre-conceived opinion of the case, or has expressed one, does not disqualify him so long as he professes his ability to find a verdict on the evidence alone, and in the absence of malice or ill-will. *State* v. *Fox,* 25 *N. J. L.* 566.

The witness Mrs. Rogers testified to having been defendant's companion on his drive in the automobile before the shooting, and mentioned certain places where they stopped, but did not know the streets or roads. She further testified that in order to identify these streets, the witnesses Doran and Sawyer, policemen, took her through the district again in a car, and she identified to them certain of the streets that she had passed through with defendant. The officers then testified to the same effect, and testified what the streets were that she pointed out. This is challenged as hearsay, but it was mere identification. If she had testified that she pointed out to the officer a certain man as tending bar at one of the places visited, but did not know his name, and the officer then testified that she had pointed out the man to him, that he knew the man and that his name was John Doe, a precisely parallel case would be presented. Identification of an unknown person by a photograph is every day practice, as witness the rogues' gallery.

When the state rested, defendant's counsel asked the court to direct the jury that a finding of guilty could not rise above murder in the second degree; and the court denied the motion at that time with leave to renew it later, but it was not renewed. The propriety of the ruling turns on the competency of the *res gestæ* and dying declarations evidence;

if that was properly admitted, a case for the jury of first degree murder was presented.

During the examination of a ballistic expert, a juror intervened with some questions, and becoming impatient at an answer, said, "why waste all this time?" The court was asked, and refused, to withdraw a juror and award a mistrial, and this refusal is alleged for error. We can see no legal error. A mistrial is discretionary, and we see no reason to think that the discretion was abused. See *State* v. *Lewis,* 83 *N. J. L.* 161; 84 *Id.* 417.

There are two other specifications, first appearing in defendant's brief and proffered at the argument. The court, after conference, decided to consider them in *favorem vitæ.* A third one was withdrawn.

The first reads as follows: "The court erroneously charged the jury that the statements [*sic*] made by the defendant to the prosecutor and admitted in evidence was a confession, when, in fact, it was not." This specifies nothing except a counsel's conclusion as to the purport of the instruction, predicated on some language of the charge which is not quoted either in the specification or in the brief, and not even cited by page number of the printed book. We find, however, a passage nearly two pages in length, from which this court is apparently expected to extract the allegedly erroneous instruction. Such a specification, or assignment of error, is futile as a cause of reversal. *State* v. *Mac Queen,* 69 *N. J. L.* 476; *affirmed, Id.* 522, 530; *State* v. *Rubertone,* 89 *Id.* 285; *State* v. *Comstock,* 95 *Id.* 321; *affirmed,* 96 *Id.* 299. But even on the merits, we find that the court in charging the jury characterized it as "an alleged confession" a number of times, and left it to the jury to say whether it was a voluntary act, charging that unless they so found, it should not be considered by them. This was, if anything, too favorable to defendant, as the voluntary character of the stateemnt is in general a question for the court. *State* v. *Dolan,* 86 *Id.* 192; *State* v. *Murphy,* 87 *Id.* 515. Moreover, the statement had gone into evidence without any objection whatever. There is no error here.

The second additional specification reads as follows: "The court erroneously charged the jury that they must find that Curtis W. Dobbins came to his death by other means, or by another person, before they could find him not guilty." Here again we have counsel's presentation of the alleged substance of an instruction, without reproducing its language. The law is clear enough, and surely sufficiently favorable to the defendant in a criminal case, and the state, representing the public, has rights which in the public interest should be enforced by the courts. In marked distinction to the rules obtaining in civil cases, the accused, even on strict writ of error, may take a general exception to the charge, leaving the trial court, and other side as well, in ignorance of what, if anything, counsel deems erroneous, and at his leisure counsel may dissect the charge and frame objections for the reviewing court alone; and under section 136 of the Criminal Procedure act, no exception need be intimated at the trial. With this handicap in his favor, the defendant should be at least held to the rule that an assignment of error or specification for reversal must conform to the practice long settled by statutes and decisions. But there is another sufficient answer, namely, that the court did *not* charge, either in the language of the specification, or in any other form, that before the jury could find defendant not guilty, they must find that Dobbins came to his death by other means, or by another person. The rule of guilt beyond a reasonable doubt was fully and correctly charged. What is attacked is an alternative suggestion in the charge that if the jury should fail to find beyond a reasonable doubt that defendant did the killing, but should find that deceased came to his death by other means, or by another person, they should acquit. The alternative, while unnecessary, was not erroneous, as it did not in any way tie down a verdict of not guilty to a specific finding that someone else did the deed. Throughout the charge, with this exception, the instructions were to find a verdict of guilty, if guilt was proved beyond a reasonable doubt; otherwise not guilty. The jury could not have misunderstood this. *State* v. *Giberson, 99 N. J. L.* 85; *J. D. Loiseaux Lumber Co.* v. *O'Reilly, 104 Id.* 510; *State* v. *Timmerari, 96 Id.* 442.

We find no harmful error. The judgment of conviction is affirmed.

*For affirmance*—THE CHANCELLOR, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, DEAR, WELLS, WOLFSKEIL, COLE, JJ. 11.

*For reversal*—THE CHIEF JUSTICE, HEHER, PERSKIE, RAFFERTY, JJ. 4.