## STATE v FIGULI

Ohio Appeals, 2nd Dist, Franklin Co

Decided Oct 6, 1938

Ralph J. Bartlett, Prosecuting Attorney, Columbus, Daniel Webber, and T. Vincent Martin, Asst. Pros. Attys., Columbus, for plaintiff-appellee.

Kenneth Little, Columbus, Bernard Little, Columbus, and Merle H. Champ, Columbus, for defendant-appellant.

## OPINION

By BARNES, PJ.

The above entitled cause is now being determined on defendant's appeal on questions of law from the judgment of the Common Pleas Court of Franklin County, Ohio.

The defendant, Stephen Figuli on Feb-

ruary 7, 1938, was jointly indicted with one Carl Boettcher for the crime of first degree murder. The indictment contained two counts reading as follows:

"1. Unlawfully, purposely and wilfully kill Robert Cline, a policeman of the City of Columbus, Franklin County, Ohio, while said Robert Cline was in the discharge of his duty as said policeman.

"2. Did unlawfully, purposely and while in the perpetration of a robbery kill Robert Cline."

The facts denote that Stephen Figuli, together with three other men from Cleveland, Ohio, came to Columbus some few days previous to February 4, 1938, for the purpose of engaging in robbery of the Hilltop Branch of the Ohio National Bank. Figuli and Boettcher arrived in the city first and after spending their first night in a downtown hotel, on the morning of the next day rented a room and garage at 183 North Guilford Avenue, Figuli paying the rent. On the morning of February 4, 1938, about 9:35 A. M. the four men after making some preliminary survey, included in which was an entrance into the bank by Figuli for the purpose of getting change, the holdup was staged. Each of the four carried guns. Figuli and Boettcher from their position near the front entrance commanded all customers within the bank to face the wall with hands up. The other two, both very large men, gave their attention to the employees. After securing some $3,500, much of which was in silver, the four men departed with their loot to a waiting automobile, and then after a zigzagging route finally landed at the rooming house which Figuli and Boettcher had formerly rented. The automobile was immediately driven into the garage after which the license plates were changed, the silver money left in the car, and the car locked. Before driving into the garage, two of the bandits had taken the currency and a number of revolvers into the room. Figuli attended to the locking of the garage. He likewise carried with him into the room revolvers. In all the bandits had in their room some eight or ten revolvers.

Following the holdup at the bank the police officers immediately started an investigation. So far as known the officers were not able to obtain any information tracing the bandits to their hideout. About noon Robert Cline, a police officer within the City of Columbus, Ohio, and three other officers were directed by their superior to cruise around the vicinity of the hold-up in search of possible clues.

About 2:30 in the afternoon their course of travel carried them to the vicinity of 183 North Guilford Avenue. A Mrs. Wotring also had rooms in this residence. One of her sons was a fugitive from the city workhouse. The officers stopped their car and Robert Cline and another offcer approached this residence presumably for the purpose of inquiring about this Wotring boy. The room occupied by the bandits was on the first floor, the entrance being from the front. Officer Cline went up the steps on to the porch and knocked at the door and got no response. The landlady had a notice on this door to call at the rear entrance. Whether or not this was seen by Cline is not known. However, the offcers retraced their steps, going around the house and near the rear entrance were met by the landlady, a Mrs. Fisk. As the two officers started around the building to the rear they motioned to the other two in the car to come in for the purpose of commanding the front of the house while Cline and his brother officer made their investigation in the rear. There is no indication that any of the officers had the slightest intimation that the bandits were in this building. When Cline and the other officer got around to the rear of the residence and after talking to Mrs. Fisk a few seconds concerning the Wotring boy, both officers opened the rear door, proceeded up a short stairway to a landing and just as Officer Cline was in front of the door leading into what proved to be the bandits quarters, a shot came through the door penetrating the body of Cline. From then on a fusillade of shots came from the interior of this room. After a time Officer Robert Cook who was with Cline at the time he was shot gained a commanding position in the room occupied by Mrs. Wotring, and from this position shot it out with the bandits, killing one and mortally wounding another. A third bandit jumped out of a window and attempted to make his escape. He was pursued by two officers, all exchanging shots as they ran. This bandit was Boettcher jointly indicted with Figuli. He was stopped in his flight by a bullet from the gun of Officer Danner, the latter also being severely wounded. Boettcher, following his trial and conviction, died from the effects of his wound. After the exchange of shots had ceased and everyone apparently out of the residence, the defendant Figuli came walking down the rear steps and at the command of Officer Cook he was required to come out with his hands up. At this

time he was unarmed. Officer Cline was rushed to the hospital and after a time died from the effects of his wound. Figuli was brought to the city prison and later questioned by Lieutenant Glen C. Hoffman. He talked freely and gave very full detailed information as to his movements and activities and those of his fellow bandits, both for several days before the hold-up and all things transpiring on that day, including the shooting through which Robert Cline was mortally wounded. He at all times denied that he did any of the shooting. According to Lt. Hoffman he told him that following the robbery was the first time they had taken their revolvers into the room. Formerly they had left them in the car. When inquired of as to the purpose of taking so many guns into the house he said they made ready to shoot it out with the police if necessary in order to protect themselves and their loot. He also stated that he knew that the police were cruising in the neighborhood, as they recognized the letters 'OQ' on their license plate which meant a police car; that they had seen the car go past two or three times, once in the alley close to the garage in which the bandit car was located; saw the car stop about 2:30 in the afternoon and two of the officers got out and approached the residence in which they were located. Officer Leo L. Phillips was one of the four participants in the episodes at the Guilford Avenue residence which finally resulted in the capture of Figuli. He testifies that he and Officer Mathis, the latter now being in California, had a conversation with Figuli at the city prison and in the course of that conversation Figuli told them that he saw the officers drive up and get out of the car and that they knew they were officers because the license plate on the car was 'CQ-234'. Neither of the four officers were in uniform, but Figuli's statement both to Lt. Hoffman and Officer Phillips was that they knew the occupants were police because of the letters 'OQ' which meant to him and his associates, police car.

Following the indictment Figuli was tried and convicted of first degree murder as he stands charged in the indictment.

Motion for a new trial was filed within the statutory time; thereafter was overruled and the defendant sentenced to be electrocuted, the jury not having recommended mercy.

Defendant duly filed notice of appeal. Defendant's assignments of errors are as follows:

1. Irregularities of the court in the interposing during the progress of the trial below of prejudicial remarks tending to indicate the conclusion of the court.

2. Irregularities of the prosecuting attorney in that during the course of his argument to the jury he read from a document not in evidence.

3. Misconduct on the part of the juror, Fred Dellinger, in that on examination as to qualifications he failed to reveal the fact that he was a full brother of one of the persons present in the Ohio National Bank at the time of the robbery referred to in the court of the evidence.

4. The verdict is not sustained by sufficient evidence.

5. That the verdict is contrary to law.

6. The admission of certain evidence that should have been excluded.

7. That the court did not fully charge the jury as to all questions of law involved and material to the issue as it would apply to the facts as developed by the evidence.

8. The court did not supply the jury forms of verdict by which the jury could have returned a finding as to guilty or not guilty as to one or either of the questions set out in the indictment.

9. Other errors of law appearing on the face of the record.

We will take up the claimed errors in the same order as set out by counsel for defendant in his assignment. In support of his claimed misconduct of the trial court attention is called to page 219 of the bill of exceptions. Lt. Hoffman was being cross-examined by counsel for the defendant as to whether or not the witness when shortly after the shooting and when he was investigating the room which the bandits had occupied saw on the floor empty shells and if he gathered them up. Lt. Hoffman answered that he saw plenty of them, but that he did not gather them up. Counsel for the defense was pressing the witness as to why he did not gather up these shells. The witness replied that he had plenty of other things to do. Inquiry was then made as to whether or not he counted them and if not why not. The witness answered that there were some fifteen or twenty officials and police officers present and that he was interested in getting them run out and having control of the situation. Counsel continued his inquiry of the officer as to whether or not he had any reason for not picking up the shells. The trial court interposed that the witness had answered that he did not pick them up and that beyond this the reason would be argumentative.

Mr. Little then made the statement:

"I want to know if he has any reason for not determining specifically that they were something. other than 45's."

The court then made the statement:

"They had something else that was more important than looking for empty shells.

"Mr. Little: I don't think so here.

"The Court: Men dying and did not know that there were other bandits in the room; isn't that more important than to look for empty shells on the floor?

"Mr. Little: They were obtaining evidence, if the court please.

"The Court: But that is purely argumentative. Now he didn't do it.

"Mr. Little: But I have a right to the answer from him.

"The Court: What is the difference why he didn't do it? He says he didn't.

"Mr. Little: Because it shows a lack of obtaining full information; that is the reason.

"The Court: In other words, you are criticizing the officer for not doing his duty. That is argumentative.

"Mr. Little: No, I want him to explain. My argument will come later.

"The Court: Well, I thought all the time it should be later.

"Mr. Little: I want my basis for the argument.

"The Court: Proceed."

Thereafter, Mr. Little continued his cross-examination along the same line and procured the answer from the witness that he was in charge of the situation at that particular time and that he did not direct anyone to collect and preserve the empty shells and cartridges. In the colloquy between counsel and the court we find nothing prejudicial.

Complaint is also made that the court was guilty of misconduct in making the following statement during his charge to the jury:

"You are performing a public function. This function is, of course, as you know, of first importance to the State of Ohio and of first importance to the defendant. Justice requires that you act fairly, honestly and considerately. If you do that you have performed your duty and the public is satisfied, but the public will not be satisfied on anything less than that performance."

The above-quoted statement is found in the early part of the court's charge and before he had stated the issues or the applicable law. It is very general and was just as favorable to the defense as it was ·the state. It is not unusual for trial courts, in fact it is the general practice, to endeavor to impress upon jurors their position as an arm of the court and the importance that they perform their duties honestly and conscienciously. We find nothing prejudicial in this part of the court's charge.

The claim is made that the prosecuting attorney during his closing argument to the jury read from a document not in evidence and that this was misconduct constituting prejudicial error.

On page 402, 403, 404 and 405, of the bill of exceptions, it appears that the prosecutor was reading to the jury questions and answers as contained in the statement made by the defendant to Lt. Hoffman and taken down by the stenographer, afterwards transcribed and· placed in the hands of the prosecuting attorney. Apparently the prosecutor during his cross-examination of the defendant used this transcript as his basis for impeachment. The claim is made that the prosecutor instead of reading from the daily transcript of the evidence read from his transcript of statement. Objection was made to the trial court and overruled with the statement that the prosecutor might read from anything limited only that what was purporting to be read must conform to the evidence in the trial. No claim is made that the prosecutor read anything different than the exact language used by the witnesses during the trial. This was a matter within the sound discretion of the trial court. We find no prejudicial error

3. **Misconduct on the part of Juror Fred Dellinger.**

The basis for this complaint is that the juror Dellinger failed to reveal on his voir dire examination that he was a full brother of one of the persons present in the Ohio National Bank at the time of the robbery referred ' to in the course of the inquiry. Affidavits were presented conclusively showing the relationship. Neither the brother nor any other customers in the bank at the time of the robbery were called as witnesses. No questions were asked of Dellinger either directly or inferentially suggesting an answer through which the relationship would have been disclosed. It is the claim of counsel for defense that the following question and answer required the juror to disclose his relationship to this brother who was in the bank at the time of the hold-up:

"Q. Do you know of anything in your own mind, whether I have suggested it to you or as to why you can not sit here as a fair and impartial juror as between the State of Ohio and the defendant, Figuli?

A. No, I don't."

The state presented an affidavit of Edward Dellinger, brother of the juror in which he admitted that he was in the Hilltop Branch of the Ohio National Bank when the bank was held up by four bandits, and then further says that he had not seen his brother Fred, the juror, since some time in the early day of January, 1938, and that at no time had he ever discussed with his brother Fred the robbery of the bank; further that neither directly nor indirectly has he ever given to his brother Fred the facts surrounding the hold-up, neither has he voiced directly or indirectly his opinions and conclusions as to the robbery of the said bank.

The state also presented the affidavit of Fred Dellinger, the juror, in which among other things he affirms the substance of what has heretofore been related as contained in the affidavit of his brother, Edward, and further states that when he was being qualified as a juror it did not even enter his mind that his brother Edward was in the bank at the time of the hold-up; further that the presence of his brother Edward was never discussed in the jury room, never entered into the deliberations of said jury; that the presence of his brother in said bank had no influence whatsoever upon his joining in the verdict reached by the jury.

The case of **McGill v State, 34 Oh St 228,** is cited by counsel for the defense. In this case a person by the same name, but not summoned as a juror, qualified and was sworn in without making disclosures that he was impersonating another person. The Supreme Court held that this constituted prejudicial error, even though the defense made no inquiry touching the identity of the individual juror in question. In the opinion attention was called to the provisions of the statute requiring the jury list to be placed in the hands of counsel for the defendant. Thereby counsel would have the opportunity to investigate before trial each and every summoned juror. In this way it would be ascertained whether or not counsel might desire to interpose a challenge, either for cause or peremptory.

When an individual takes his seat in the jury box in response to the call of his name, the court and counsel would be warranted in assuming that he was the individual intended to be summoned. Of course the appearance of someone other than a summoned juror would at once be ground of challenge for cause. We think that the case is readily differentiated from the instant case.

The defense knew or could readily have ascertained before trial that there were a number of persons in the bank at the time of the hold-up. Had they considered this a matter of importance, inquiry could have been made as to whether or not any member of the panel was related in any way to the manager, employees or customers in the bank. The Supreme Court of Ohio has repeatedly held that the failure of counsel to make proper inquiry of jurors by such omission waives all objections to the juror's competency, which in the exercise of reasonable diligence could have been ascertained. **Watts v Ruth, 30 Oh St 32; Keurick v Reppard, 23 Oh St 333; 24 O. J. p. 230, §102; McGill v State, 34 Oh St 228,** first paragraph of the opinion.

We think there is a marked distinction where the objection to the juror was one where under the facts challenge for cause would be required to be allowed and where had the facts been known peremptory challenge might have been exercised.

In the instant case the fact that a Mr. Dellinger, who was in the banking room at the time of the hold-up was a brother of juror Dellinger was not the ground of challenge for cause. We think the trial court was right in his determination that the complaint as to Juror Dellinger was not a ground for new trial.

4. **The verdict is not sustained by sufficient evidence.**

5. **The verdict was contrary to law.**

These two assignments of error will be considered together. The determination of these claimed grounds of error requires a very full and careful reading of the record. This we have done and some parts of it we have read two and three times. As a starting premise we must have in mind that the indictment contained two counts each charging murder in the first degree and the prescribed punishment being the same as to each count. Also that the verdict of the jury as returned was general and read as follows:

"We, the jury in this case find the defendant Stephen Figuli guilty of murder in

the first degree as he stands charged in the indictment.

Earl Sigrist,
Foreman."

Further that the court did not submit to the jury separate verdicts for each of the two counts; that counsel for the defendant made no request that the court so do nor was any request made for separate findings. The record also discloses that neither at the close of the state's evidence nor at the close of all the testimony was there motion interposed for directed verdict as to either of the two counts. It also appears that counsel for defendant before argument submitted to the trial court in writing seven separate distinct requests to charge. The first four special requests related to the second count of the indictment, and 5, 6 and 7 related to the first count of the indictment.

Sec 13437-3, GC, among other things, provides as follows:

"Sec 13437-3 GC —Two or more offenses in one indictment. An indictment or information may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses under separate counts."

The case of **Jackson v State, 39 Oh St p. 37**, in some of its aspects is very similar to the instant case. The opinion was by Judge Okey and on page 40 he narrates some of the pertinent facts upon which their decision was predicated.

The indictmet was for murder and contained in two counts. The jury after being sent out for deliberation returned into court with the following verdict:

"Guilty as charged in the first count of the indictment."

The trial court refused to receive this verdict and sent the jury back for further deliberation after which they returned into court with the following verdict:

"We the jury on the issues joined find the defendant guilty as he stands charged in the indictment."

Counsel for defendant saved his record by objection and exception to both the first and second verdicts. The judge in his opinion states:

"The prisoner might have been sentenced under the first verdict for the count on which it was based was sufficient."

Syllabus 4 reads:

"4. While the court may it is not bound to receive a verdict which finds the defendant guilty of one count without any finding as to the other counts; and as a general rule where such verdict is tendered the court should require the jury to deliberate further so as to be able to respond to each count."

We now state the following legal proposition which we think the authorities amply sustain: If the evidence relating to one count of the indictment is adequately supported the verdict must stand even though the evidence as to the other count can not be sufficient to support a verdict of first degree murder or any included crime.

It may be contended that under a general verdict such as was returned in the instant case it is impossible to ascertain whether or not the jury intended to return verdicts of guilty as to both counts or if only one, which one. Under the situation in the instant case we have presented the well recognified two-issue rule. If a verdict is responsive to an issue of the case upon which no error presents itself, such verdict will not be set aside because of manifest prejudicial error as it relates to other issue or issues.

This rule is founded upon the principle that prejudicial error must affirmatively appear, and unless the losing party has preserved his record so as to show the manifest error every presumption will be indulged to sustain the verdict.

We now consider the weight of the evidence as it applies to the first count of the indictment. We find every requisite adequately supported by competent testimony. True, defendant's testimony in some very substantial particulars differs from that of other witnesses. Yet the weight of the evidence was wholly with the jury and they were warranted in believing the testimony of the state's witnesses rather than that of the defendant.

It is strenuously urged that the state has failed to prove that the defendant knew that Cline and his three companions were officers. Two witnesses presented by the state testified that the defendant told them that he knew they were officers because he recognized the letters 'OQ' on the license plates as being a state or police car. Further, that he and his companions saw them

get out of the car and come towards the house. Undoubtedly they heard the knock at their door although there is no evidence that they did or did not. There is evidence that the knock was made by Cline. The fact that the bandits started shooting through the door before either Cline or Cook had touched the knob of the door clearly indicates that they were aware of the approach of these officers.

It is further urged that the state has presented no evidence that the defendant Figuli fired a single shot nor has it presented evidence of a conspiracy through which Figuli would be **particeps criminis** to the action of any of the others.

We think there is abundance of evidence to show conspiracy even though there is no direct evidence that Figuli himself fired a single shot. In fact there is no direct evidence as to which one of the four bandits fired the shot that struck Cline. Three of the bandits are dead. Figuli alone survives and was unscathed through the gun fire. He seeks to place all responsibility on the three bandits who are now deceased.

Lt. Hoffman in his testimony says that Figuli told him that following the hold-up at the bank they took nine or ten guns into their room for the purpose of fighting it out with the police if they were discovered. Furthermore, that this was the first time that they had taken the guns into the room. True, Figuli denies that he had made any such statement to Lt. Hoffman, but again, it was a factual question for the jury. Under the situation as developed in the instant case very little evidence would be required to support the question of conspiracy. In fact a jury would be warranted in so finding from the circumstances of the hold-up at the bank by four men, the retreat of the four to a common hide-out, in providing themselves with an arsenal of from nine to ten guns and the firing through the door before the officers had made their presence or purpose known would be sufficient circumstances to support conspiracy.

Finding, as we do, that the evidence supports every element of the crime charged in the first count of the indictment, it is unnecessary to go into the question of the claimed insufficiency or other errors as it pertains to the second count of the indictment. We are unable at the moment to call to mind any evidence presented pertinent to the second cause of action that would not likewise be pertinent to the first cause of action. For this reason it is not necessary, as frequently happens, to separate the evidence as it relates to separate and distinct causes of action.

6. **The admission of certain evidence that should have been excluded.**

The brief of counsel for defendant does not mention this claimed ground of error and hence we dismiss it with the statement that the claim is not well taken.

7. **That the court did not fully charge the jury as to all questions involved and material to the issue as would apply to the facts as developed by the evidence.**

Counsel for the defense in their brief seek to extend this claimed ground of error beyond this language. Several pages are devoted to the court's refusal to submit to the jury prior to argument seven separate and distinct propositions of law. The Supreme Court of Ohio has very definitely decided that the civil practice rule requiring the court to give instructions to the jury before argument provided such requests correctly state the law, does not apply in criminal cases. The reasoning of the court for the distinction is wholly by reason of their construction of the criminal section being different in its language from the civil section. We will do no more than cite the cases. **Wertenberger v State of Ohio, 99 Oh St 353; Grosseweiler v State, 113 Oh St 46; Reicker v State, 119 Oh St 190.**

One or more of the cases above cited has determined that while the trial court in its discretion may decline to give the requested instructions before argument, yet that the substance of such requests, if pertinent and a correct statement of the law must be given in the general charge without any further request to either include in the general charge or made at the close of the court's charge. As heretofore stated, special requests numbers 1, 2, 3 and 4 relate exclusively to the second count of the indictment. For reasons heretofore stated and under the state of the record it is immaterial whether or not the court correctly or incorrectly charged relative to the crime of murder in the commission of a robbery.

Numbers 5, 6 and 7 relate to the first count of the indictment. The general charge of the court correctly charged the jury on each and every question that is suggested in special requests Nos. 5, 6 and 7. We find no prejudicial error in the charge of the court.

8. **The court did not supply the jury forms of verdict by which the jury could have returned a finding as to guilty or not guilty as to one or either of the counts set out in the indictment.**

The bill of exceptions contains the charge

222

of the court in its entirety. On page 427 the court said to the jury that he was submitting to them five forms of verdict. What the court said relative thereto is now set out in full:

"There will be submitted to you five forms of verdict. The first is that you find the defendant guilty of murder in the first degree, and that form is to be used whether you find him guilty as to the first count or the second count or both.

"The second form that you find him guilty of murder in the first degree as he stands charged in the indictment and recommended mercy. That is to be used whether you find him guilty on the first or second count or both.

"The third form is that you find him not guilty of murder in the first degree as he stands charged in the indictment, but find him guilty of murder in the second degree. That can only apply to the first count. If as I have already stated to you there was a conspiracy and Robert Cline was killed, but the fact that he was a police officer in the performance of his duty was not known by the defendant or his co-conspirators, if they were co-conspirators, then he is not guilty of murder in the first degree but may be guilty in the second degree if the killing was intentional and in that connection I should say that the law assumes that a person is presumed to intend the natural consequences of his acts and the firing directed at another person with a deadly weapon the objective of that person, if in a vital spot would entitle the jury if they so found to conclude that the person who fired the shot intended to kill.

"But if you find that there was no knowledge that Robert Cline was a policeman or that he was in line with his duty and there was no intention to kill but simply a promiscuous shooting that would reduce the offense to manslaughter which is the killing of another person while engaged in an unlawful act where there was no intention, no purpose, no knowledge of his being a police officer in line with his duty and while the killer or the co-conspirator as the case might be was not engaged in the perpetration of a robbery.

"And the last form of verdict is that the defendant is not guilty as he stands charged in the indictment."

We think it is the better practice for trial courts to submit separate and distinct verdicts as to each of the several counts of an indictment. However, in the absence of a request so to do a trial court commits no error in submitting the general verdict applying to all counts. Most assuredly counsel cannot sit idly by and make no request as to the form of verdict, particularly where he has heard the court tell the jury the forms that he is submitting and thereafter inquires of counsel if they have anything further to suggest or request. The following was the language of the court:

"Has the defense anything further to suggest or request? Have I omitted anything concerning which I should have charged?

"Mr. Little: I don't think of anything."

We find no prejudicial error under assignment No. 8.

9. Other errors of law appearing upon the face of the record.

None other are called to our attention and we pass No. 9 with the general statement that we find no prejudicial error, and therefore the verdict and judgment of the court will be sustained.

HORNBECK and GEIGER, JJ, concur.