STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOSEPH GRILLO, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. SILVIO DE VITA, DEFENDANT-APPELLANT.

Argued June 7, 1954—Decided June 28, 1954.

*Mr. George R. Sommer* argued the cause for the appellant Joseph Grillo.

*Mr. Harry Kay* argued the cause for the appellant Silvio De Vita.

*Mr. Charles V. Webb, Jr.,* Essex County Prosecutor, argued the cause for the respondent (*Mr. C. William Caruso,* Special Assistant Prosecutor, of counsel, on the brief).

The opinion of the court was delivered by

BURLING, J. ·These two appeals certified under *R. R.* 1:10–1(*b*) were from two comparable orders of the Essex

County Court denying motions for new trial made by the defendants-appellants, Joseph Grillo and Silvio De Vita. The crime of which these defendants had been convicted was murder, in the first degree.

On November 9, 1951, James Law, a special officer, was shot and killed during a robbery perpetrated as he was escorting a supermarket manager from his store to a bank with the day's receipts. The facts concerning this robbery appear in more detail in the opinion of this court in *State v. Grillo,* 11 *N. J.* 173 (1952).

On February 25, 1952 these defendants, Joseph Grillo and Silvio De Vita, and a third individual Ralph Rosania, were placed on trial for the killing of James Law. The indictments charged each of them with commission of the offense of murder in the first degree. On March 8, 1952 all three were convicted of that offense. The jury recommended life imprisonment as to Rosania but made no recommendation as to Grillo and De Vita.

Grillo and De Vita appealed. Their convictions were sustained by this court on December 15, 1952. *State v. Grillo, supra* (11 *N. J.* 173 (1952)), *certiorari* denied, *De Vita v. State of New Jersey,* 345 *U. S.* 976, 73 *S. Ct.* 1123, 97 *L. Ed.* 1391 (1953). Subsequently De Vita sought release upon a writ of *habeas corpus.* After a hearing, on July 14, 1953, the Superior Court, Law Division, discharged the writ. *In re De Vita,* 27 *N. J. Super.* 101 (*Law Div.* 1953). This judgment was affirmed by this court on October 19, 1953. *In re De Vita,* 13 *N. J.* 341 (1953), *certiorari* denied, *De Vita v. State of New Jersey,* 346 *U. S.* 923, 74 *S. Ct.* 309, 98 *L. Ed.* (1954).

On March 25, 1954 defendant Grillo moved for new trial, asserting that he had been "denied due process of law in that he was tried by a jury which could not have heard the case if the facts now known had been revealed at the time the jury was selected." The facts alleged were that Arthur Kuhnle, one of the jurors, during the night of March 30, 1951 (almost 11 months prior to the trial of Grillo, De Vita

and Rosania for participation in the Law killing) had been the victim of a street robbery at gunpoint. A newspaper article, indicating on its face that it was published on the day of the robbery of Kuhnle, was attached as an exhibit to Grillo's motion papers. This newspaper article named and identified an Arthur Kuhnle as a night manager of a Western Union office and gave a detailed account of the affair. The record shows that the juror Arthur Kuhnle stated on the *voir dire* prior to being accepted as a juror in the Grillo-De Vita-Rosania trial, that he, Kuhnle, was employed by the "Western Union Telegraph Company" as a "Night manager." At the hearing on Grillo's motion for new trial on March 25, 1954 the State and Grillo's counsel stipulated that the argument proceed with the understanding that Arthur Kuhnle and the alleged victim of the March 30, 1951 robbery were the same individual, "subject to verification." Although this was unusual procedure we do not find it necessary to remand these matters for formal verification of that fact.

The transcript of the proceedings of the trial of Grillo, De Vita and Rosania, relating to the examination of jurors was "Received in evidence" on Grillo's motion. After examination of the transcript and after hearing argument on the motion, the Essex County Court denied the motion on March 25, 1954.

Counsel for De Vita had been present in the County Court during the proceedings on Grillo's motion. On April 15, 1954 De Vita made a comparable motion for new trial. An affidavit was filed on De Vita's motion in which the affiant stated, "My inquiries confirm the fact that Arthur Kuhnle, is the same person who sat as juror No. 5 in the trial of this cause * * *." Counsel for De Vita, at the hearing on the motion on April 15, 1954, stated that he had been present at the argument of Grillo's motion on March 25, 1954 and had no desire to argue his motion any further. The Essex County Court denied De Vita's motion for new trial on April 15, 1954.

Grillo and De Vita in their present separate appeals each stated only one question involved, namely, whether the trial court erred in denying his motion for new trial. We find no error.

The contentions of Grillo and De Vita depend upon the facts hereinbefore recited resulting from the record upon the motions and the trial proceedings. On page 49 of the transcript of the trial proceedings it appears that a prospective juror Clifford L. Gould (later excused by the state) on the *voir dire* was asked: "Has anyone ever attempted to commit a robbery against you or any other member of your family?" Gould's answer was "No, sir." Gould was the sixth prospective juror to be examined under oath, and the only one of the first ten prospective jurors so examined who was asked such a question (Kuhnle being the tenth examined under oath). In all, 80 prospective jurors were examined. Thirty-three were comprehensively examined, the remainder were partially examined. Of the 33 comprehensively examined only seven were questioned as to whether they or members of their family had ever been robbery victims. Of the 33, 14 were sworn as trial jurors; of these 14, only three had been asked the question relating to robbery attempts on them or their families. The examination of Arthur Kuhnle began at page 69 of the transcript of the trial proceedings. Examination of Kuhnle by Grillo's counsel included the following:

"Q. Have you read anything about this case? A. Yes, I have.

Q. As a result of what you have read in the newspapers have you any firm, imbedded conviction as to the innocence or guilt of the defendants in this case? A. No, I have not.

Q. Can you, if selected as a juror, approach this case with an open mind? A. I can.

Q. Would you, if selected as a juror, give the defendants the benefit of any reasonable doubt that might arise from the evidence? A. Yes, sir.

Q. Do you know of any reason why you cannot sit as a juror in this case? A. No, I know of none."

\*        \*        \*        \*        \*        \*        \*        \*

"Q. Does the fact that the person who was killed happened to be a special officer create in your mind any prejudice against the defendants? A. No.

Q. Can you, if selected, try this case without any prejudice, without any passion against the defendants, and with a clear, open mind decide it fairly upon the evidence? A. Yes, sir."

Examination of Kuhnle by De Vita's counsel included the following:

"Q. You heard the interrogations this morning, did you not? A. Yes, sir.

Q. And I assume you followed them? A. Yes.

Q. Let me repeat to you my position with reference to the client I represent, Mr. De Vita. I am interested in only one thing in this inquiry into the competency of the jurors and that is that the jury who finally occupy the box to try this case is open minded, free of any prejudice of any kind, nature or description whether it be because the man who was killed was a policeman or an officer of the law, whether the nationality of the defendants—anything at all that you might think of that would prejudice you? A. I would have no prejudice at all.

Q. You think you could approach this case which is under consideration: that is, that there are three defendants all charged under the theory of the State's case with murder in the first degree. I think the evidence will show that one of the three is the man who actually fired the shot which killed Mr. Law. Do you think you will be able as a juror to differentiate between the three defendants and, if you find all three guilty of murder in the first degree, be able to follow the second part of your right, namely to recommend life imprisonment for one or two or all three of them notwithstanding the fact that one of them actually fired the shot? A. I think so.

Mr. McGlynn: That's all."

And examination of Kuhnle by Rosania's counsel included the following:

"Q. You formed no opinion of the guilt or innocence from reading the newspapers in this case? A. I have not.

Q. Or from having discussed it with anyone? A. No, sir.

Q. Your mind is free, open and unprejudiced? A. That's correct.

Q. Will you accord the defendant Ralph Rosania and his witnesses under oath the same credibility that you would give police officers under oath? A. I would.

\*       \*       \*       \*       \*       \*       \*       \*

Q. You don't know any of the State's officers or personnel? A. No, sir.

Q. Do you know of any reason that you can give why you could not sit as a fair and impartial juror in this case and be guided only by the evidence and the charge of his Honor? A. I know of no reason, no."

Upon the conclusion of the *voir dire* examination Kuhnle was accepted as satisfactory by the State, and by each of the defendants. He was duly sworn and served as a member of the trial jury.

Grillo and De Vita now contend that Kuhnle, although not asked whether he had ever been a robbery victim, should have volunteered that information. They did not contend at the hearings on their motions for new trial that the answer "yes" to such a question would establish a ground for a challenge for cause. Their contention reiterated on these appeals was that such an answer "would have been sufficient basis for a peremptory challenge, because at the time that he was questioned, the defendants had plenty of challenges left."

*N. J. S.* 2A:78–4 provides as follows:

"Upon the trial of any cause, civil or criminal, all parties may, within the discretion of the court, question any person summoned as a juror, after his name is drawn from the box and before he is sworn as a juror, and without the interposition of any challenge, to elicit information for the purpose of determining whether or not to interpose a peremptory challenge, and of disclosing whether or not there is cause for challenge. In all cases in which a death penalty may be imposed, the examination as to competency shall be under oath, but in other cases it shall be made without putting the juror under oath. Such questions shall be permitted for the purpose of disclosing whether or not the juror is qualified, impartial and without interest in the result of the action. The questioning shall be conducted under the supervision and control of the trial judge and in open court."

■■ Diligence at the *voir dire* examination of Kuhnle under *N. J. S.* 2A:78–4, *supra,* would have brought the Kuhnle robbery incident to light. A wide latitude is allowed counsel in examining on the *voir dire*. *State of New Jersey v. Bunk,* 4 *N. J.* 461, 468 (1950), *certiorari* denied 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615 (1950). *Cf. Carlotz v. Gavin,* 132 *N. J. L.* 52, 53–54 (*Sup. Ct.* 1944),

affirmed 133 *N. J. L.* 61 (*E. & A.* 1945). But the mere fact that the juror *could* have been peremptorily challenged is not, under these circumstances, sufficient ground for granting a new trial. 3 *Wharton's Criminal Practice* (10*th ed.* 1918), *sec.* 1785, *p.* 2237; *State v. Figuli,* 36 *N. E.* 2*d* 19, 24 (*Ohio Ct. App.* 1938), appeal dismissed for want of a debatable constitutional question, 134 *Ohio St.* 495, 17 *N. E.* 2*d* 920 (*Ohio Sup. Ct.* 1938). *Cf. State v. Schmieder,* 5 *N. J.* 40, 43–44 (1950); *State v. Deliso,* 75 *N. J. L.* 808, 812 (*E. & A.* 1908); *State v. Lyons,* 70 *N. J. L.* 635, 642–643 (*E. & A.* 1904); 31 *Am. Jur., Jury, sec.* 119, *p.* 647. See also *Kohl v. Lehlback,* 160 *U. S.* 293, 299–303, 16 *S. Ct.* 304, 40 *L. Ed.* 432, 434–435 (1895).

█ The law in this State concerning peremptory challenges is well settled. It stemmed from the practice prevailing in England; if the challenge is not made before the juror is sworn the privilege of peremptory challenge ceases. *State v. Lyons, supra* (70 *N. J. L.,* at *pages* 642–643). In the same category is *Francis v. Southern Pacific Co.,* 333 *U. S.* 445, 450–451, 68 *S. Ct.* 611, 92 *L. Ed.* 798, 804 (1948). In the *Francis* case, *supra,* Mr. Justice Douglas said (333 *U. S.* at *page* 450, 68 *S. Ct.* at *page* 614, 92 *L. Ed.,* at *page* 804) concerning a contention that the trial jury panel was improperly drawn:

"\* \* \* We do not stop to inquire into the merits of the claim. The objection was made for the first time in the motion for a new trial. It seems to have been an afterthought \* \* \*. If not an afterthought, it is an effort to retrieve a position that was forsaken when it was decided to take a gamble on the existing jury panel. In either case the objection comes too late. \* \* \*"

Similarly, in a murder case, it was contended that the defendant was deprived of a constitutional right that he could not waive when the trial court (without objection by the defendant) permitted the trial to continue when it was discovered during the trial that a juror had been convicted of a felony, which was contrary to the juror's statement on the *voir dire.* The United States Supreme Court held

that the defendant's contention "plainly" was not the law. *Queenan v. Territory of Oklahoma*, 190 *U. S.* 548, 551–552, 23 *S. Ct.* 762, 764, 47 *L. Ed.* 1175, 1178 (1903). It was held that the defendant "* * * could not speculate on the chances of getting a verdict and then set up that he had not waived his rights. * * *" *Ibid. Cf. Alexander v. United States,* 138 *U. S.* 353, 11 *S. Ct.* 350, 34 *L. Ed.* 954, 956 (1891). Compare *Mima Queen v. Hepburn,* 7 *Cranch* 290, 297, 11 *U. S.* 290, 3 *L. Ed.* 348, 350 (1813).

█ Regardless of the procedural bar to the assertion of a peremptory challenge to a juror, upon a motion for new trial, we will examine the merits of the defendants' contentions in view of the fact that both Grillo and De Vita have been sentenced to death. As the United States Supreme Court, in *Crawford v. United States,* 212 *U. S.* 183, 194, 29 *S. Ct.* 260, 264, 53 *L. Ed.* 465, 470 (1909), stated:

"In criminal cases courts are not inclined to be as exacting with reference to the specific character of the objection made as in civil cases. They will, in the exercise of a sound discretion, sometimes notice error in the trial of a criminal case, although the question was not properly raised at the trial by objection and exception. * * *"

Compare *R. R.* 1 :5–1(*a*), (*b*) ; *R. R.* 3 :7–11(*a*).

██ In some jurisdictions, in apparent application of the foregoing principles, it seems to be provided by statute that in the discretion of the court a verdict may be set aside for disqualifying bias of a juror not discovered or suspected by the defendant or his counsel before the juror was sworn. See *Johnson v. United States,* 225 *U. S.* 405, 419–420, 32 *S. Ct.* 748, 56 *L. Ed.* 1142, 1147 (1912). See also Annotations, 3 *A. L. R.* 2*d,* at *pages* 513 *et seq.* In the *Johnson* case, *supra,* the United States Supreme Court held that such a statute did not permit the defendant (convicted of murder and sentenced to death) to assert on appeal that the jury was not lawfully drawn. However, even the question of bias must be raised on the *voir dire,* and the trial court's determination is a matter of broad discretion although subject to the essential demands of fairness. *Aldridge v. United States,*

283 *U. S.* 308, 310, 51 *S. Ct.* 470, 75 *L. Ed.* 1054, 1056 (1931).

The appellants rely on *Panko v. Flintkote Co.*, 7 *N. J.* 55, 61 (1951). The *Panko* case, *supra*, dealt with the impropriety of a juror's discussion of a pending case during a visit to a friend's home, during the course of which occasion the friend had telephoned the defendant in that case inquiring as to the amount of liability insurance carried by the defendant in that case. It was the intrusion of the knowledge of the insurance coverage, and the surreptitious method by which it was obtained during the course of the trial, that tainted the verdict in the *Panko* case, *supra*. Entirely different circumstances prevail in the present case.

Asked whether he knew of any reason why he, Kuhnle, might be prejudiced against the defendants, or any of them, Kuhnle repeatedly averred his impartiality and there is no scintilla of evidence of bias, prejudice or partiality on his part.

The sole question here is whether bias may be imputed to a juror in despite of his sworn statement that he was not biased, upon the mere showing that the juror at a time in the past had been a victim of armed robbery.

It has been held that where a defendant at a criminal trial challenged neither of two jurors for actual bias though afforded the fullest opportunity legally and factually for doing so (which is the situation in the present case) "he could not challenge them successfully in a motion for a new trial." *Frazier v. United States*, 335 *U. S.* 497, 512–513, 69 *S. Ct.* 201, 210, 93 *L. Ed.* 187, 198–199 (1948).

On the merits there is no charge in this case of actual bias, and the imputation of bias to Kuhnle, as a matter of law, because he once had been the victim of highway robbery is only surmise and speculation and "* * * would be no more sensible than to impute bias to all storeowners and householders in cases of larceny or burglary." *Dennis v. United States*, 339 *U. S.* 162, 167, 70 *S. Ct.* 519, 521, 94 *L. Ed.* 734, 740 (1950); *United States v. Wood*, 299

*U. S.* 123, 149–150, 57 *S. Ct.* 177, 81 *L. Ed.* 78, 90 (1936). The law assumes that every citizen is equally interested in the enforcement of the criminal law. *Cf. Connors v. United States,* 158 *U. S.* 408, 413–414, 15 *S. Ct.* 951, 39 *L. Ed.* 1033, 1035 (1895). There is no case made here that the facts are such as in law necessarily raise the presumption of partiality. *Cf. Ex parte Spies,* 123 *U. S.* 131, 8 *S. Ct.* 22, 31 *L. Ed.* 80, 90 (1887). In this respect the oral opinion of the trial court, County Court Judge Joseph E. Conlon, on the Grillo motion for new trial aptly stated:

"If such ground as this were considered by the Court some two years after the trial, the Court would be setting a precedent whereby after every conviction in a criminal case there might be a re-examination of the intimate life of every person who sat on the jury, going back an indeterminate space of time, and if that minute examination of the past life of any one of the twelve jurors revealed any information that might (not that would, but that might) have some bearing upon the juror's verdict, there would be established a ground for setting aside the verdict and granting a new trial. I think the mere statement of that proposition answers itself. The situation could be reduced to an absurdity."

■■ Even assuming that imputed bias of the category asserted by Grillo and De Vita exists, it is not as strong as a preconceived opinion of guilt. Such a preconceived opinion of, guilt is not a ground for challenge for cause where the juror states his impartiality under oath to the satisfaction of the trial judge, in the absence of a clear showing of abuse of discretion. It is well settled in this State that the fact that a juror has a preconceived opinion of the case, or has expressed one, does not disqualify him so long as he professes his ability to find a verdict on the evidence alone and in the absence of malice or ill-will. *State v. Jefferson,* 131 *N. J. L.* 70, 72 (*E. & A.* 1943); *State v. Stephan,* 118 *N. J. L.* 592, 603 (*E. & A.* 1937); *Wilson v. State,* 60 *N. J. L.* 171, 182 (*E. & A.* 1897). *Cf. Ex parte Spies, supra* (123 *U. S.* at *page* 177, 8 *S. Ct.* at *page* 29, 31 *L. Ed.,* at *page* 90).

Finally Grillo asserted on this appeal that Kuhnle had falsely denied that he knew "any of the State's officers or

personnel." This point finds no support in the record except insofar as stated in the newspaper article referred to in Grillo's petition for new trial, namely: "According to police, Kuhnle ordinarily called for a police escort each night."

This point was not raised below and the juror was not heard thereon. Nevertheless, it is a fair inference that even if the juror had occasional city police protection, that he answered the question as any reasonable person would do when not versed in the law, namely that "State's officers or personnel" meant State of New Jersey officials or employees and not City of Newark police or County of Essex officials. The question should have been lucidly submitted.

Even so, even if it meant otherwise, there is no evidence that that subject matter created a bias, prejudice or partial status in the mind of the juror.

█ In summary, the trial court did not deprive these defendants of their right to elicit information from the juror upon which a peremptory challenge might have been effected; no cause for challenge is demonstrated and no bias, prejudice or partiality can be imputed to the juror under the circumstances of this case. *Cf. Buchalter v. People of State of New York*, 319 *U. S.* 427, 430, 63 *S. Ct.* 1129, 87 *L. Ed.* 1492, 1496 (1943); *State v. Langhans*, 95 *N. J. L.* 213, 217 (*E. & A.* 1920).

█ A motion for a new trial is addressed to the sound discretion of the trial judge, to be exercised with a view to the manifest rights of the parties and the prevention of injustice and oppression under all the circumstances of the case. *State v. Bunk*, 4 *N. J.* 482, 484, 485–488 (1950); *Sokol v. Liebstein*, 9 *N. J.* 93, 99 (1952). There was no abuse of discretion in the present matter.

For the reasons expressed in this opinion we affirm the order of the Essex County Court of March 25, 1954 denying Joseph Grillo's motion for new trial and affirm the order of the Essex County Court of April 15, 1954 denying Silvio De Vita's motion for new trial.

WACHENFELD, J. (dissenting). Although the specific question in controversy was not asked of the juror Kuhnle, nevertheless the purpose of counsel was obvious and plain as the inquiry had already been put to another prospective juror.

One who has been assaulted, threatened with a deadly weapon and robbed is not likely to forget or forgive nor to treat lightly or even fairly similar conduct in others. This is a normal human reaction following customary behavior, expected and anticipated by the background of experience.

Counsel were endeavoring to secure jurors who had not been embittered by having been subjected to the same treatment which was the basis of the charge pending against the accused. They made it quite clear they were trying to avoid triers of fact who had suffered a like factual occurrence.

That was the kind of jury the defendants were entitled to but were unsuccessful in obtaining, as evidenced by the disclosures after trial.

A life should not be taken by legal process unless every reasonable doubt is resolved in favor of the condemned, and unless the best judicial procedure has been "rigidly and jealously enforced," *State v. Auld*, 2 *N. J.* 426, 442 (1949), dissenting opinion.

I would reverse.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, BURLING, JACOBS and BRENNAN—5.

*For reversal*—Justices HEHER and WACHENFELD—2.