**UNITED STATES of America, ex rel. Silvio DE VITA, Appellant,**

v.

**Lloyd W. McCORKLE, Principal Keeper of the New Jersey State Prison at Trenton, New Jersey.**
**No. 11726.**

United States Court of Appeals
Third Circuit.

Argued Feb. 9, 1956.

Reargued Jan. 8, 1957.

Decided Aug. 6, 1957.

As Corrected Aug. 16, 1957.

Writ of Certiorari Denied Nov. 12, 1957.
See 78 S.Ct. 121.

Kalodner, Maris and Goodrich, JJ., dissented.

Isadore Glauberman, Jersey City, N. J., for appellant.

C. William Caruso, Newark, N. J. (Charles V. Webb, Jr., County Pros., Essex County, Newark, N. J., on the brief), for respondent.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The problem here is whether there was fundamental unfairness in appellant's trial. Finally, and very late, it is conceded within this court that the same question was before the state court and that we are bound to decide the appeal on its merits. There remains only the suggestion that since Rosania, the third defendant, received a sentence of life imprisonment the jury acted fairly, though it had as one of its members, a disqualified person. From the facts, even if the jury had consisted of twelve patently prejudiced people they still would have found a major differentiation between Rosania and the other defendants, DeVita and Grillo. The latter two committed the holdup, Grillo firing the fatal shot. Rosania, a former employee of the place which was robbed, had been in on the planning of the robbery but in the words of the trial court's charge to the convicting jury, " * * * *Ralph Rosania was not at the scene of the actual killing.*" (Emphasis supplied). That is obviously the reason why he was given a recommendation of mercy by the jury. In the situation it might be well to remember that preconceived vacuum conclusions must yield to the record in even this wretched case. "The proponent before the Court is not the petitioner but the Constitution of the United States."[1] Therefore the chain of events which makes it obligatory for us at this time to pass on the merits of the appeal should have been examined and faced up to prior to anyone attempting to reach a conclusion on the specific issue confronting us.

On March 30, 1951, juror Kuhnle, carrying a night deposit from the Western Union office where he was night manager, to the National State Bank, was held up on Broad Street, Newark, New Jersey, and robbed of $1,287.00. He regularly had a police escort when he made his nightly deposits. On November 9, 1951, seven months later, several blocks away on the same Broad Street, Thomas Lofrano, manager of the Universal Food Market, was taking his receipts to another Broad Street branch of the National State Bank for a nightly deposit. He and James Law, a uniformed special police officer, left the market and entered Law's automobile on Broad Street for that purpose. Appellant and Joseph Grillo held them up, took the receipts and in the course of the robbery Law was killed by a shot from Grillo's gun. Thereafter, "An investigation by the Newark police and the Essex County Prosecutor's office ensued, directed to the solution not only of the Law killing but of other then unsolved robberies in the area."[2] The petitioner, Grillo, and one Rosania, an accomplice, were quickly apprehended. They signed confessions, admitted the facts, and actually had no defense to the charge of murder under the New Jersey felony-murder statute. The real problem before the trial jury was whether its verdict should be "guilty" without any recommendation (in which event the death penalty was mandatory) or "guilty" with a recommendation of life imprisonment. Court, counsel and everyone else concerned were aware of this.

From the transcript of the voir dire of the 81 talesmen summoned, it is evident the defendants, through their counsel, sought to excuse from jury membership persons who had robbery experience, directly or indirectly, or close association or relationship with personnel of law enforcement agencies.

1. Mr. Justice Harlan in Chessman v. Teets, 77 S.Ct. 1127, 1132.

2. State v. Grillo, 11 N.J. 173, 177–178, 93 A.2d 328, 330.

The State's effort was directed almost exclusively to keeping off the jury persons with scruples about capital punishment. This strongly pointed up the prosecution's primary objective, the obtaining of the death penalty against De Vita and Grillo. All defendants had offered to plead to the life-term offense.

Juror Kuhnle was the tenth talesman called and the fifth juror accepted. An earlier prospective juror had been queried on previous robbery experiences. Kuhnle's attention was directed to the questions put to the other panel members but he did not disclose that he had recently been held up and robbed. He was specifically asked whether he knew any of the State's officers or personnel. He answered in the negative although it is now shown that he knew a number of Newark police since he ordinarily called for a police escort each night and though his own holdup had been in all likelihood investigated and handled by the "Bandit Squad" of Newark police, as was the case to be tried.[3] During the selection of jurors for another day and a half, counsel for the defendants pleaded with the talesmen for frank disclosure of any possible source of prejudice, asking many of them if they had ever been robbed, etc., and if they had acquaintance or relationship with any law enforcement personnel, local, state or federal. One talesman mentioned a fifteen year earlier robbery experience; she was challenged and excluded. One mentioned relationship to someone working in the jail—excluded. A talesman knew a detective who had worked on the case; he was excused by consent. One, whose office in the vicinity of the holdup had been broken into, was excused by defendant Rosania. Two were excused because they worked in banks and the money robbed was being taken to a bank. Of one, the court said, "This gentleman carries considerable money in his business for his employer, and in fairness to the defendants I think I had better excuse him." Through all these incidents in his presence and hearing, juror Kuhnle sat quiet and in the course of the long questioning of seventy more talesmen failed to disclose his own robbery experience, his nightly journey to deposit his employer's receipts in the bank, or his acquaintance with a substantial number of police department personnel.

The State's theory and modus operandi in trying the indictment was not calculated to leave the memory of juror Kuhnle's recent encounter at rest. There were remarks "to the effect that these defendants were members of an organized criminal group"[4] in Newark. The defendants and an undetermined number of their acquaintances of similar background were referred to repeatedly by the Prosecutor as "Associates, Inc." It was shown that one of the defendants had not worked for some months prior to the crime, but was financially affluent. The pistols used in the holdup were alluded to as the defendants' "stock-in-trade" for some months prior to the crime. The following excerpt from the Prosecutor's summation to the jury vividly illustrates the position in which Kuhnle, as trial juror #5, had placed himself, whether he was striving to be impartial or not:

"  *    *    *    The Associates Incorporated: Rosania, DeVita, Grillo,

3. The far fetched assertion that the State's officers and personnel did not include the local police witnesses falls flat when it is remembered that the title of this matter as tried was "State of New Jersey v. Joseph Grillo, et als." and that ordinary reference in Essex County to the prosecution at a trial was and is to the "State", to the "State's case", to the "State's witnesses." The New Jersey State Police do not function in Newark or Essex County. They had no connection whatsoever with this trial. Colloquially speaking the only police officers associated with the prosecution of this indictment were the local Newark police. The others concerned were the Essex County Prosecutor, his assistants and his detectives. The latter are not usually called "police officers" but rather "prosecutor's detectives" or "county detectives".

4. State v. Grillo, 11 N.J. 173, 184, 93 A.2d 328.

Cardone, Aulisi, Mucci, Angelo, Petrucci, Pontilla; the Associates Incorporated.

"Why, they would stick you up, Mr. Juror No. 6, and you Mrs. Garrabrant, and you, Mr. George * * *."

After that amazing, violent assertion to the jury by the prosecutor, vividly reminding Kuhnle of his own ordeal, how could the latter have functioned other than short of the constitutional standard of impartiality.

When Kuhnle's history came to appellant's attention he sought relief in the state courts. His motion for a new trial, among other things, was founded on his affidavit which was part of the motion and which, after stating the previous robbery of Kuhnle and that he, DeVita had no knowledge of it during the trial, said, "Had I known of this fact, I would have requested my attorney, Edward R. McGlynn, to excuse said juror; I being of the opinion that such a juror, having been the victim of a holdup and this homicide having occurred in a holdup, *the probability is that the said Arthur Kuhnle, as a juror, had a preconceived enmity, prejudice and bias against me and could not render an impartial verdict.*" (Emphasis supplied). Mr. McGlynn, DeVita's trial attorney in his affidavit, also part of the motion, said, "Had the said Arthur Kuhnle made *full and fair disclosure to me that he had been a victim of a robbery,* I would have interposed a challenge for cause and had the challenge been denied, I would have interposed a peremptory challenge to excuse the said Arthur Kuhnle as a juror in this cause." (Emphasis supplied).

The Grillo petition for a new trial which with the DeVita motion was handled as the one application by the trial judge itself alleged the known facts, that those facts "must have been known or at least should have been known to the prosecutor but [which] he did not disclose * * *" during the trial and that *Kuhnle "concealed" the facts on his voir dire.* In the argument on the Grillo petition which was titled in the names of Grillo and DeVita, counsel, in connection with his offer of proof, urged that Kuhnle be subpoenaed to prove facts averred in the petition. The court, deeming that unnecessary, assumed some of the facts and proceeded to dispose of the contentions in the petition as follows:

"There is no indication that the Prosecutor or any representative of the Prosecutor or of the State had any knowledge of the incident that occurred to Mr. Kuhnle in March, 1951 and therefore, I can give that suggestion no consideration.

" * * * there was no obligation on Mr. Kuhnle's part to volunteer any information as to the incident, assuming, (which I do not feel we can do), that he even thought about it."

The court went on to hold that the allegation of bias of a juror after verdict under the circumstances would not be entertained and proceeded to dismiss the suggestion as an "absurdity" in the following language:

"If such a ground as this were considered by the Court some two years after the trial, the Court would be setting a precedent whereby after every conviction in a criminal case there might be a re-examination of the intimate life of every person who sat on the jury, going back an indeterminate space of time, and if that minute examination of the past life of any one of the twelve jurors revealed any information that might (not that would, but that might) have some bearing upon the juror's verdict, there would be established a ground for setting aside the verdict and granting a new trial. I think the mere statement of that proposition answers itself. The situation could be reduced to an absurdity."

In the appeal to the New Jersey Supreme Court the charge of bias against Kuhnle because he had himself been robbed shortly before and had concealed that fact which had been heard by the

trial judge, was again urged. In addition, as a second reason for prejudice on the part of Kuhnle it was alleged that he had falsely denied he knew any of the State's officers or personnel. *There can be no doubt but that this second branch of the bias issue was also submitted.* The state court opinion State v. Grillo, 16 N.J. 103, at pages 114–115, 106 A.2d 294, at page 300 reads:

"Finally Grillo asserted on this appeal that Kuhnle had falsely denied that he knew 'any of the State's officers or personnel.' This point finds no support in the record except insofar as stated in the newspaper article referred to in Grillo's petition for new trial, namely: 'According to police, Kuhnle ordinarily called for a police escort each night.'

"This point was not raised below and the juror was not heard thereon."

The comment of the court that Kuhnle had not been heard on the accusation that he knew the State's officers or personnel is interesting. He had not been heard on the charge of bias and concealment arising out of his own robbery either for the trial court had refused to have him brought in and examined. As to that charge the State Supreme Court held, 16 N.J. at page 114, 106 A.2d at page 299: "There is no case made here that the facts are such as in law *necessarily* raise the presumption of partiality." (Emphasis supplied.) If further proof of either or both charges had been needed by the State Supreme Court, that body had authority to order a hearing. New Jersey by its constitution provides that its Supreme Court shall have original jurisdiction of any cause before it.[5] Notwithstanding the court's above strong intimation of the possibility of establishing prejudice if proofs were permitted no hearing was ordered and no hearing was held. Petitioner as a practical matter had reached the end of New Jersey justice. The State Supreme Court took the same direction as and adopted the language of the trial court quoted above. Petitioner had to look elsewhere if any federal rights he possessed were to be upheld. Having unsuccessfully asked three justices of the United States Supreme Court for a stay of execution pending application for certiorari, he went into the district court where a stay was denied but a certificate of probable cause granted.

On appeal we reversed the district court and sent the matter back there for further proceedings in accord with Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469. The district court examined the documentary evidence and *concluding no unusual circumstances existed* denied the petition for habeas corpus. That is the decision for our consideration on this appeal.

The issue before the district court was the biased fraud of Kuhnle in (1) concealing the fact that he had been robbed in much the same fashion and in the same vicinity seven months prior to the Law holdup; and (2) denying that he knew any of the State's officers or personnel connected with the trial. Each of these branches was of paramount concern to the defendants. Both were directly passed upon by the district judge. He held as to the first that "there is no proof that Kuhnle *intentionally* concealed any information or *intentionally* misled counsel." (Emphasis supplied.) The court stated the second contention and its conclusion as follows: [133 F. Supp. 178.]

"The second allegation of fact is that Kuhnle told an untruth when he answered no to the question 'You don't know any of the State's officers or personnel?' According to the newspaper article describing the Kuhnle robbery incident, he ordinarily called for a police escort each night and subsequent to the robbery he was questioned by three Newark detectives. There is no contention

---

5. N.J.Const. art. 6, § 5, ¶ 3:
    "The Supreme Court * * * may exercise such original jurisdiction as may

be necessary to the complete determination of any cause on review."

that the Supreme Court of New Jersey did not give fair consideration to this issue and the offered evidence. Did that court reach a satisfactory conclusion in holding that even if Kuhnle ' * * * had occasional city police protection, that he answered the question as any reasonable person would do when not versed in the law, namely that "State's officers or personnel" meant State of New Jersey officials or employees and not City of Newark police or County of Essex officials. The question should have been lucidly submitted.'

"This court agrees with that opinion. Additionally, in response to the form in which the question was asked, assuming Kuhnle did 'know' local police, he did not lie. He was not asked whether he knew any local officers or personnel, just as he was not asked if he ever had been a victim of a robbery. Thus, for the reasons already set forth, this court concludes that DeVita has not been denied due process of law."

### Exhaustion of State Remedies

■ The trial court said flatly it would not consider the allegation that the prosecution knew of Kuhnle's experience; it dismissed the allegation of "concealment" by the juror of his holdup as insufficient in law to warrant a new trial and threw out the relator's conclusion of "enmity, bias and prejudice" as unfounded and an "absurdity".

The New Jersey Supreme Court affirmed that decision and *entertained under its original jurisdiction the new charge that "Kuhnle had falsely denied that he knew any of 'the State's officers or personnel' "*. On this allegation that court, while it inferred that Kuhnle probably did not understand the query to include employees of the county—like the prosecutor or of the city—like the police, could not close the door to the inclusiveness of the phrase. In its dilemma the whole subject of Kuhnle knowing one or more of the law enforcement people connected with the state's case was eliminated by the comment that assuming such relationship there was no evidence it caused Kuhnle to be prejudiced.[6] With the possibility of this grave condition admitted, the state court may have been content in that decision to forget about it as it had regarding the admitted possibility of bias stemming from the robbery discussed above. However, under Brown v. Allen, supra, we cannot do that for it would be monstrous to pretend that the state has given fair consideration to this part of the prejudice claim and reached a satisfactory conclusion.

The relator's New Jersey proceeding which contained all the allegations that are before us was there held insufficient in law to warrant a new trial. The state process had therefore been exhausted without relief for relator by the week of August 15, 1954 when he invoked the federal remedy.

### The Writ Should Issue Now

■ Under the law as it is today, both federal and New Jersey, the admitted facts demonstrate bias to the extent that it voids the process. Appellant's allegations are so substantial that the State Supreme Court, later approved by the federal district court, could only remark that they do not *"necessarily* raise the presumption of partiality." (Emphasis supplied.) During its last term the United States Supreme Court set aside a conviction because of an experience to a juror which was far less im-

---

6. The court said:
"* * * it is a fair inference that even if the juror had occasional city police protection, that he answered the question as any reasonable person would do when not versed in the law, namely that 'State's officers or personnel' meant State of New Jersey officials or employees and not City of Newark police or County of Essex officials. The question should have been lucidly submitted.

"*Even so, even if it meant otherwise,* —there is no evidence that that subject matter created a bias, prejudice or partial status in the mind of the juror." (Emphasis supplied.)

pressive than the Kuhnle incident and though the juror *testified* that he was unprejudiced.[7] Remmer v. United States, 1956, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435.

The New Jersey Supreme Court, on the closely related question of whether a verdict is invalidated where a sitting juror is interested in a similar type of case, recently sharply receded from its decision in this matter when in Wright v. Bernstein, 1957, 23 N.J. 284, 129 A.2d 19, that court set aside an $82,000 judgment on the ground that a juror failed to disclose on his voir dire that his mother had a personal injury action pending. There the juror had been interrogated after the verdict and there had been affirmative findings that he in good faith had misunderstood the question on the voir dire and had acted fairly in weighing the evidence. There also only a five-sixth majority of the jury was needed to render a valid verdict. It is most noteworthy that the justices who had dissented to the Grillo opinion were of the majority in Wright v. Bernstein, supra, and that the writer of Grillo dissented. That the law of the Grillo case gave very little trouble to the same court in Wright v. Bernstein appears from the opinion at page 294 of 23 N.J., at page 24 of 129 A.2d:

> "The appellant argues the misleading and deceptive information here relied on was properly elicited in an authorized proceeding conducted before the court, under its direction and by virtue of its authority and appellant had the right to rely upon the answer given as one given fully and truthfully; that in the instant matter the juror in question was individually interrogated and

the questions addressed to him were simple in nature and clear in import *which was not the case in State v. Grillo, 1954, 16 N.J. 103, 106 A.2d 294*; Olivo v. Strand Engineering, Inc., App.Div.1954, 30 N.J.Super. 544, 105 A.2d 435; Springdale Park v. Andriotis, supra [30 N.J.Super. 257, 104 A.2d 327].

> "The misconduct here complained of is not a failure to answer a question improperly presented and unclear in nature but rather is that the answer given by design or otherwise was deceptive and misleading. As we see it there can be no doubt had the prospective juror answered the inquiry truthfully, he would have been peremptorily challenged, if the court overruled a challenge for cause. Therefore, the question is whether the right of challenge was denied by the prospective juror's failure to disclose the information sought pertinent and necessary to the decision of counsel. On the question of challenge it is the prospective juror's state of mind with relation to the issue to be tried, and his predilections that were relevant to the inquiry of fitness."

(Emphasis supplied.)

What was clear or unclear to the Wright v. Bernstein juror is irrelevant under that court's own reasoning for either way the party was misled by the answer.

The Tennessee Supreme Court in circumstances much like the cause at bar set aside a conviction under an "impartial jury" guarantee in the State Constitution. Const. art. 1, § 9. Durham v. State, 1945, 182 Tenn. 577, 188 S.W.2d 555, 160 A.L.R. 746.[8] See also Kerr v.

---

7. Long ago, Chief Justice Marshall ruled that a person "may declare that he feels no prejudice in the case; and yet the law cautiously incapacitates him from serving on the jury; because it suspects prejudice; because in general, persons in a similar situation would feel prejudice." United States v. Burr, 1807, 25 Fed.Cas. 49, 50.

8. That case involved a trial on an indict-

ment for rape. Under a guarantee of an impartial jury in the Tennessee Constitution, the conviction was invalidated on the ground that one juror had been a prosecuting witness in a trial for assault with intent to rape several years prior to his jury duty. That action had been placed on the "retired" docket some three years prior to the crime

B. F. Goodrich Co., Ohio App.1936, 31 N.E.2d 709, 712.

■ The assurance of an impartial tribunal is too vital to be subjected to speculation concerning the quantum of prejudice flowing from this grossly disqualified juror. In a capital case at least counsel should be able to rely on prospective jurors answering questions with candor and not be forced to deal with each talesman as a hostile, evasive witness.[9] This principle was especially applicable to the trial of appellant and his co-defendants the design of which was to have the jury pass on the essentially judicial question of sentence, life or death, instead of the traditional jury fact finding and determination of guilt or innocence. For that kind of trial the Fourteenth Amendment insists on the most impartial tribunal the reasonable needs of society will permit.[10] With Kuhnle a member of it, the DeVita-Grillo jury was not that sort because "One who has been assaulted, threatened with a deadly weapon and robbed is not likely to forget or forgive nor to treat lightly or even fairly similar conduct in others. This is a normal human reaction following customary behavior, expected and anticipated by the background of experience."[11]

The subsequently discovered undisputed facts make out colorable bias in a juror who was a part of the verdict which caused appellant and his confederate to be sentenced to death. The big practical difficulty with the proper resolution of the simple problem presented was that the shocking revelation about

for which he was called as juror. On those facts, the court held that a legal presumption arises from the want of that impartiality which the Tennessee Constitution contemplates. Regarding the absence of additional evidence, it is stated at 160 A.L.R. 751:

"We have nothing to suggest an abatement of his interest in that case and its prosecution, nothing as to his connection with it or how close or otherwise his relationship to the wronged female. We are left to conjecture what elements of suggestive similarity exist between the facts of the assault in his case and those of the instant case. Certainly a presumption obtains that he entertained and still harbors a grievance against that other ravisher, intensified, perhaps, by frustration of his desire for vengeance. Surely, it requires no argument to convince that a man so circumstanced would not enter upon the trial of this accused free from that natural feeling of resentment which had moved him to institute and keep alive a prosecution for a like offense. As this case progressed his mind inevitably would turn to his own unsatisfied wrong and his judgment would be so affected thereby as to deprive him of the capacity to act impartially, disinterestedly, and dispassionately."

9. In Clark v. United States, 1933, 289 U.S. 1, 11, 53 S.Ct. 465, 468, 77 L.Ed. 993, Mr. Justice Cardozo, spoke of outright nullification of a proceeding where one of the jurors failed on the voir dire to come forward with information affecting her impartiality:

"There is a distinction not to be ignored between deceit by a witness and deceit by a talesman. A talesman when accepted as a juror becomes a part or member of the court. In re Savin, 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150; United States v. Dachis, D.C., 36 F.2d 601. The judge who examines on the voir dire is engaged in the process of organizing the court. If the answers to the questions are willfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only. His relation to the court and to the parties is tainted in its origin; it is a mere pretense and sham. What was sought to be attained was the choice of an impartial arbiter. What happened was the intrusion of a partisan defender. If a kinsman of one of the litigants had gone into the jury room disguised as the complaisant juror, the effect would have been no different. The doom of mere sterility was on the trial from the beginning."

10. In this connection in Tumey v. Ohio, 1926, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749, it is said of a judge with a personal interest in the outcome of litigation:

" * * * a possible temptation to the average man as a judge * * * not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law."

11. From the then minority opinion in State v. Grillo, 16 N.J. 103, 116, 106 A.2d 294, 300.

the juror came at a most inopportune time, long after this notorious trial had ended and the defendants had been sentenced. The appeals had been exhausted, nothing remained except the execution of the sentences. When the news finally did become public there was a refusal to accept it for what it was, namely, a weighty prejudicial occurrence that may have destroyed a fair trial and which cried out for correction. The closeness of Kuhnle's connection with the trial content is frightening. At the argument it was conceded that the trial court would have insisted that he be excused. The district judge frankly expressed his own opinion when he said to the state prosecutor (appearing for appellee), *"In fact I believe Judge Conlon himself would have disqualified him (Kuhnle)."* (Emphasis supplied.)

Kuhnle's was a far greater probable bias than that which, as we have seen, in several instances was recognized at the DeVita trial jury selection to be so serious it called for the direct excusing of talesmen. Yet the district judge ignored it as indicating no "unusual circumstances." That is the entire motivation of the district court opinion. It acknowledges that the basic issue "vigorously argued before this court" had been "submitted to the Supreme Court (of New Jersey)"[12] but denies the application for the writ on the state court theory that the facts do not "necessarily raise a presumption of partiality." In so doing on this record the inherent concept of a fair trial is repudiated. We cannot agree to that course. Nor can we agree to the proposition that a juror's privacy after verdict is invulnerable where the competing consideration is possible deprivation of human life. No policy is strong enough to prevent correction of errors of the nature outlined. The Supreme Court spoke cogently on that subject in Clark v. United States, supra, 289 U.S. at page 16, 53 S.Ct. at page 470, saying: "No doubt the need is

weighty that conduct in the jury room shall be untrammeled by the fear of embarrassing publicity. The need is no less weighty that it shall be pure and undefiled. A juror of integrity and reasonable firmness will not fear to speak his mind if the confidences of debate are barred to the ears of mere impertinence or malice. He will not expect to be shielded against the disclosure of his conduct in the event that there is evidence reflecting upon his honor. The chance that now and then there may be found some timid soul who will take counsel of his fears and give way to their repressive power is too remote and shadowy to shape the course of justice. It must yield to the overmastering need, so vital in our polity, of preserving trial by jury in its purity against the inroads of corruption." See United States of America ex rel. Luzzi v. Martin, D.C. E.D.Pa. Nov. 23, 1956.

In allowing the writ we reiterate what we have already said to the effect that the one disputed point at the trial of the defendants in the state court was 'whether the jury should recommend life imprisonment. We do not understand that there is a New Jersey procedure which will permit the retrial of appellant and Grillo on the question of sentence alone. If we are mistaken as to this the writ will be for the purpose of granting a new trial limited to that question. Otherwise a new trial will be generally allowed. In either event appellant will remain in the custody of the State of New Jersey.

The orders of the district court of July 14 and 25, 1955 will be reversed and the cause remanded to that court for the issuance of a writ of habeas corpus in accordance with the above outlined terms.

HASTIE, Circuit Judge (concurring).

I am in substantial agreement with the opinion of the court and add this brief concurrence only to emphasize those con-

12. The state prosecution specifically agrees with this. It states to us "that the constitutional question involved has been fairly considered by the highest State Court."

siderations which to me seem decisive in this case. This seems worthwhile because the role of the federal courts in these challenges to the essential fairness of state criminal convictions is a particularly difficult one. It becomes our duty to distinguish between state action which we merely disapprove as unwise or undesirable, and that which in our best judgment is intolerable. It was the inherent difficulty in thus separating the intolerable from the merely undesirable which caused the division of this court in such cases as United States ex rel. Darcy v. Handy, 3 Cir., 1955, 224 F.2d 504, and United States ex rel. Smith v. Baldi, 3 Cir., 1951, 192 F.2d 540. It divides us again here. Accordingly, I think it desirable to restate as precisely as I can the combination of circumstances which to me makes it intolerable that this death sentence should be permitted to stand.

As Judge McLaughlin has spelled out in greater detail, there came a time in the post-conviction proceedings in the New Jersey courts when this much was clear beyond any possible need for additional inquiry or fact finding.

1. The primary responsibility of the jury in this murder trial was to choose between the death penalty and life imprisonment as the appropriate punishment for defendants who for all practical purposes had conceded their guilt of homicide in the commission of armed robbery.

2. A few blocks from the place of this robbery-homicide, and only eight months earlier, juror Kuhnle had been the victim of an armed robbery. Moreover, his work as night manager of a telegraph office involved the responsibility of frequently taking deposits of money to the bank late at night. The continuing substantial risk of armed robbery to which Kuhnle was thus subjected had been dramatized and emphasized by providing him with a police escort.

3. During the interrogation of prospective jurors many questions were addressed to various talesmen which showed that any past connection with armed robbery was a matter of special concern. Hearing these questions must have made crystal clear to Kuhnle what the dictates of average intelligence should in any event have suggested; namely, that in response to the general inquiry made of all jurors concerning possible disqualifying circumstances, he should have disclosed for the evaluation of the court and counsel his recent dramatic and impressive experience with an actual armed robbery and precautions against the danger of recurrence.

4. In addition, as Judge McLaughlin has also pointed out, the prosecutor's appeal to the jury, climaxing other items of similar purport, was worded and calculated to make the jurors apprehensive for their own safety from armed robbery, and to induce them to judge the appropriate punishment of the defendants in the light of the jeopardy in which they themselves stood because of such evil doers.

To me it is inconceivable that Kuhnle's own experience, as emphasized and brought vividly to mind by the government's case and the prosecutor's appeal, could have left this juror capable of objective determination of the appropriate punishment for these defendants. In these circumstances, it was fundamentally unfair and inconsistent with our concept of the unbiased administration of justice that Kuhnle should have participated in the decision whether the accused should live or die. Once this picture of one of the jurors was fully revealed in the proceedings which followed conviction and sentence, I think it was the duty of the New Jersey courts under the due process clause to order a new trial or a redetermination of the sentence. By the same token I think it is our duty now.

I am authorized to state that Chief Judge BIGGS concurs in the views expressed herein.

KALODNER, Circuit Judge, with whom MARIS and GOODRICH, Circuit Judges, concur, dissenting:

With slight paraphrase this is the sum of the majority's position:

DeVita and his co-defendants signed confessions, admitted the facts, and actually had no defense to the charge of murder under the New Jersey felony-murder statute; they had offered to plead to the life-term offense; the one disputed point at their trial in the state court (New Jersey) was whether the jury should recommend life imprisonment; for that kind of a trial the Fourteenth Amendment insists on the most impartial tribunal the reasonable needs of society will permit; with Kuhnle a member of it, the DeVita-Grillo jury was not that sort because one who has been assaulted, threatened with a deadly weapon and robbed is not likely to forget or forgive nor to treat lightly even fairly similar conduct in others; the subsequently discovered undisputed facts (of Kuhnle's holdup, failure to disclose it at his voir dire examination, and his statement then that he didn't know State's officers or personnel) make out colorable bias in a juror who was part of a verdict which caused DeVita and his confederate Grillo to be sentenced to death; under the law as it is today, both federal and New Jersey, the admitted facts demonstrate bias to the extent that it voids the process.

Judge HASTIE in his concurring opinion brings into even sharper focus his and the majority's conclusion that Kuhnle must be held as a matter of law so biased and prejudiced by reason of his own holdup experience that his participation in the petitioners' trial was in violation of due process.

Said Judge HASTIE:

"To me it is inconceivable that Kuhnle's own experience * * * *could have left this juror capable of objective determination of the appropriate punishment for these defendants.* In these circumstances, it was fundamentally unfair and inconsistent with our concept of the unbiased administration of justice that Kuhnle should have participated in the decision whether the accused *should live or die."* (Emphasis supplied.)

In ruling that as a matter of law "the admitted facts demonstrate bias to the extent that it voids the [due] process" the majority fails to give proper weight to these indisputable critical facts:

(1) three men were involved in the felony-murder case, DeVita, Grillo and Rosania, and all were tried at the same time by the jury of which Kuhnle was a member; it was not just a "DeVita-Grillo" jury;

(2) the jury made a recommendation of life imprisonment with respect to Rosania although it did not do so as to DeVita and Grillo on their return of a verdict of guilty of murder in the first degree as to all three men.

In considering these facts the majority makes these three points:

(1) " * * * if the jury had consisted of twelve patently prejudiced people they still would have found a major differentiation between Rosania and the other defendants, DeVita and Grillo."

(2) DeVita and Grillo " * * * committed the holdup, Grillo firing the fatal shot."

(3) "Rosania, a former employee of the place which was robbed, had been in on the planning of the robbery *but * * * was not at the scene of the actual killing."*

As to the first of these points it need only be said that "patently prejudiced people" do not make "differentiation[s]," "major" or minor; it is the disregard of differentiating factors which is the hallmark of prejudice.

The second and third points may be considered together.

The majority's statement that DeVita and Grillo "committed the holdup"; Rosania "had been in on the planning of the robbery" but "was not at the scene of the actual killing" is correct as far as it goes but it does not go far enough, as will be seen from the following undisputed facts.

Rosania had worked intermittently for brief periods in 1948, 1949 and 1950 for Universal Food Market. Some six weeks prior to the November 9, 1951 date he suggested to a group of which DeVita was a member that it would be "easy" to rob Universal. He subsequently further discussed the suggestion with DeVita and Grillo. In a reconnaissance or "casing" operation he worked at Universal on November 2, 1951 and reported the fruits of his observations to DeVita and Grillo, specifically how Thomas Lofrano, manager of Universal, and James Law, its private policeman, nightly proceeded to deposit Universal's daily receipts at a nearby bank.

On the evening of November 9, 1951, Rosania, DeVita and Grillo proceeded to the Delaware, Lackawanna and Western Railroad station where was stored in a locker Grillo's brief case containing revolvers and ammunition. Rosania and DeVita went into the station and got the brief case. Rosania carried it out to Grillo and opened it. DeVita took from it a 32 automatic and Grillo a Beretta automatic; the murder weapon. Rosania then took the brief case back to the locker. The three men then proceeded to the Universal Food Market. They sat on a bench in the park facing the market and perfected the plan of operations. Rosania made a search for Law's car in a parking lot adjacent to the Universal Market but could not find it. He later pointed out Lofrano and Law while they moved about in the market. He then left after having arranged with DeVita and Grillo to call him at a diner after the holdup was completed. Some 10 or 15 minutes later Lofrano and Law emerged from the market, the former carrying a paper bag containing the day's receipts (some $5,000 in cash) and Law walking behind him. Reaching his car Law entered and sat in the driver's seat; Lofrano sat to his right. Grillo went to Law's side of the car with drawn revolver; DeVita to Lofrano's side with drawn revolver. This is a stickup, they said. It was at this juncture that Grillo's gun was fired

and Law was fatally wounded, dying about two hours later. Grillo grabbed the money bag and he and DeVita fled the scene. Later they contacted Rosania and he picked them up in a friend's car. When DeVita phoned Rosania he asked what happened in the robbery. Several days later the three men were arrested, they confessed, some of the proceeds of the theft were discovered and the murder weapon recovered.

All three men at the beginning of their trial sought to enter pleas of non vult or nolo contendere to the crime of murder in the first degree; the State's attorney refused to agree because under New Jersey law the maximum punishment under such plea would be imprisonment for life.

DeVita's counsel and Grillo's counsel in their summations to the jury frankly conceded that their clients must be found guilty of murder in the first degree but pleaded for a merciful life imprisonment recommendation—DeVita on the grounds of youth; he "had not drawn his gun"; he did not intend there should be gunplay or a killing—Grillo on the grounds that he had not intended to shoot Law; his gun went off accidently.

Rosania's counsel made a plea to the jury for acquittal on the ground that he had withdrawn from the holdup plan before the crime took place and that he had attempted to dissuade DeVita and Grillo from going through with the holdup. Incidentally, both DeVita and Grillo denied the latter and their testimony further established Rosania's participation in the plotting of the holdup up to the very moment he departed because he feared recognition by former fellow employees of Universal.

The trial judge instructed the jury that if they believed Rosania's contention that he had withdrawn from the holdup plan before it was consummated he must be acquitted. The jury's verdict of guilty as to Rosania demonstrated its rejection of the withdrawal contention. Its recommendation of life imprisonment certainly cannot be said to be due to a warranted "major differentiation be-

tween Rosania and the other defendants, DeVita and Grillo" because, as the majority puts it, "The latter two committed the holdup, Grillo firing the fatal shot."

As the trial judge properly charged the jury, the crime of all three men was of a piece of Rosania had not withdrawn from the holdup plan before the shooting, and his mere absence from the scene at the time of the shooting was not a critical circumstance. The fact that the jury made a merciful recommendation of life imprisonment amply demonstrates that it was not a prejudiced jury; far from that fact, it could well be said, under the circumstances overwhelmingly established by the evidence, that it was indeed merciful to a fault.

Kuhnle's participation in the merciful recommendation is eloquent testimony of an absence of prejudice on his part in the DeVita-Grillo-Rosania trial and is a dispositive answer to the critical focal point of the majority's position that the only real issue at the trial of the defendants was "whether the jury should recommend life imprisonment" and that Kuhnle was so biased and prejudiced that he could not have fairly decided that issue.

The majority's determination that Kuhnle was so biased as to pollute the stream of justice in violation of due process seems to me to be insupportable in view of the fact that he and the jury of which he was a member recommended life imprisonment for Rosania.

"The assurance of an impartial tribunal" says the majority, "is too vital to be subjected to speculation concerning the quantum of prejudice flowing from this grossly disqualified juror."

Does not the recommendation as to Rosania obviate any necessity for "speculation concerning the quantum of prejudice flowing from this grossly disqualified juror" and does not that recommendation demonstrate that the majority erred in describing Kuhnle as "this grossly disqualified juror?"

It is not amiss to note that it was Rosania's counsel who had asked Kuhnle whether he knew any of the "State's officers or personnel" and in the light of Kuhnle's joining his fellow jurors in the merciful life imprisonment recommendation as to Rosania, it is difficult to see how the majority can find fraudulent concealment or bias because of Kuhnle's negative answer to that question.

This may be a proper place too, to note that the majority's statement that "* * * it is now shown that he [Kuhnle] *knew a number of Newark police* since he ordinarily called for a police escort each night * * *" is based on surmise and surmise only. The only evidence on the score of Kuhnle's contact with policemen—contained in the newspaper clipping relating to his holdup—was that *prior* to it he "ordinarily called for a police escort each night" and that subsequent to it he was interrogated by three detectives in the usual routine investigation. It would be just as reasonable to assume that it was the same policeman—covering his beat—who was Kuhnle's escort when he had one, and such a probability ought not to be summarily rejected in favor of a surmise which would provide the premise for branding Kuhnle as a scheming perpetrator of a fraud on the judicial process with three men's lives at stake in the offing.

Of the same fabric is the majority's premise that Kuhnle deliberately and fraudulently concealed his own holdup experience.

On this score the majority has this to say:

"Juror Kuhnle was the tenth talesman called and the fifth juror accepted. An earlier prospective juror had been queried on previous robbery experiences. Kuhnle's attention was directed to the questions put to the other panel members but he did not disclose that he had recently been held up and robbed."

That statement certainly fails to place in proper perspective the incident discussed.

**14**

This is what the record discloses actually happened.

During the morning session of the first day of the DeVita-Grillo-Rosania trial nine prospective jurors were examined in considerable detail by three attorneys who separately represented the defendants, counsel for the State, and the presiding judge. Talesman No. 6, was asked the question "Has anyone ever attempted to commit a robbery against you or any other members of your family." The answer was "No, sir". The first five talesmen were not asked that question or anything resembling it nor were talesmen Nos. 7 and 8 who were subsequently examined prior to the luncheon recess.

Kuhnle—talesman No. 10, was the first juror examined at the afternoon session. After he had been questioned at some length by Grillo's counsel and State counsel he was interrogated by DeVita's counsel. The latter in the course of his examination questioned him as follows:

"Q. You heard the interrogations this morning, did you not?

"A. Yes, sir.

"Q. And I assume you followed them?

"A. Yes."

The foregoing makes it quite clear that Kuhnle's attention was not specifically directed to the question put to talesman No. 6 relating to any robbery experience, although the majority's statement as to the incident might be so construed.

It may be noted parenthetically that of the seventy-one talesmen examined after Kuhnle only six were asked a specific question as to robbery experience. Thus out of a total of eighty-one talesmen called for voir dire examination only seven were questioned as to robbery experience.

Coming now to the majority's reference to the prosecutor's summation to the jury in which he stated: "Why they would stick you up, Mr. Juror No. 6,

and you, Mrs. Carrabant, and you, Mr. George * * * " [1] As to that incident the majority states: "After that amazing, violent assertion to the jury by the prosecutor, vividly reminding Kuhnle of his own ordeal, how could the latter have functioned other than short of the constitutional standard of impartiality."

The jury's recommendation of life imprisonment as to Rosania is a dispositive answer to the apprehensions expressed in the majority's rhetorical question and by Judge HASTIE.

Even independent of the circumstances that the jury's extension of mercy to Rosania demonstrated absence of bias, prejudice and fraud on Kuhnle's part, I could not subscribe to the majority's view (and that of Judge HASTIE) that what was said or left unsaid by Kuhnle evidenced fraudulent concealment, bias, and prejudice as a matter of law without more.

The Essex County Court, Law Division, of New Jersey, held that fraud could not be imputed to Kuhnle as a matter of law. On appeal, after an extensive review, the Supreme Court of New Jersey affirmed, under the caption State v. Grillo, 1954, 16 N.J. 103.[2]

The District Court following two hearings and an examination of the entire record reached these conclusions:[3]

"But there is no evidence that Kuhnle was not an impartial juror in that his deliberations or vote or those of his fellow jurors were influenced by the robbery incident. Nor is there any evidence from which to infer that Kuhnle was a biased juror. There is no proof that he intentionally deceived counsel into accepting him as a juror. * * * The fact that eleven months prior to the trial Kuhnle was a robbery victim is not a disqualification as a matter of law; there is no proof of actual bias nor of facts from which to infer bias; there is no proof that Kuhnle intentionally concealed any information, or intentionally misled counsel."

1. Kuhnle was Juror No. 5.

2. 106 A.2d 294.

3. D.C.N.J.1955, 133 F.Supp. 169, 176, 177, 178.

Thus, prior to reaching this court, three courts, the lower and appellate courts of New Jersey and the District Court held that the record did not and could not support a judicial determination that fraud could be imputed to Kuhnle as a matter of law as the majority and Judge HASTIE now declare. It may be observed parenthetically that the conclusion noted was reached even without expressed consideration of the fact that the Kuhnle jury had extended mercy to Rosania.

In this connection it is of more than passing interest that counsel for DeVita in the instant appeal in his reply brief (page 2) stated:[4] "While there may be an honest difference of opinion as to whether the evidence from the state court record is sufficient to establish the allegations of fraudulent concealment as set forth in the petition * * *"

Implicit in the majority's determination and that of Judge HASTIE in this case is the concept that man is made of such stuff that he will balk at nothing to wreak vengeance even unto death upon any of a class which has wronged him— he will be oblivious to the divine teaching "Vengeance is mine, I will repay, saith the Lord"—he will stealthfully and cunningly conceal his vengefulness even to the point of breaking his solemn oath as a juror—that these unworthy human attributes are so patent that courts must take judicial notice of them and hold as a matter of law that they exist and cannot be curbed—this though there is absent a single shred of evidence to sustain such a determination in a particular case.

I cannot subscribe to such an indictment of man. In holding Kuhnle as a matter of law guilty of fraudulent concealment and bias to the extent that he would exact death as a vengeance for his holdup almost a year earlier, the majority has stripped from him the presumption of innocence which the law places as a cloak of protection even about one who stands trial on the charge of murder.

The New Jersey Supreme Court dwelt at length on the focal points of Kuhnle's voir dire examination in its opinion in State v. Grillo, supra, as did the District Court, and it would serve no useful purpose to repeat here what they said.

DeVita's appeal is based on the premise that the District Court erred in two respects (1) it failed to impute fraud to Kuhnle as a matter of law; and (2) it did not afford him a hearing at which he could adduce testimony to establish actual fraud. The first point has already been discussed. As to the second, only this need be said—DeVita made no offer in the District Court (nor has he here) sufficient to raise factual questions. All he did in the District Court was to make an offer to go on a fishing expedition in uncharted waters which in his opinion *might* yield a "catch" of helpful evidence.

That is clearly manifest from his counsel's statement at the April 25, 1955 hearing held by the District Court on the remand (p. 32 N.T.):

" * * * We want a hearing, because we had no opportunity and the state court should have ordered that hearing to examine Kuhnle in detail—whom did he know; how many police did he know; what detectives did he know; were they the same detectives and police that were in the DeVita-Grillo case? That we want to know, unless your Honor is satisfied from the record that there was fraud committed."

Mere speculation on the part of a petitioner that a juror *may have* intentionally concealed a material fact will not justify his recall, years later, to determine his state of mind at the time of his voir dire examination. Unrestricted inquiries into the mental processes of jurors long after they have completed their function as such can only ultimately lead to the destruction of the jury system. United States ex rel. Darcy v. Handy, 3 Cir., 1953, 203 F.2d 407, at page 419. Ample opportunity is given through the medium of the voir dire for both sides to search out the juror, and

4. Filed with this Court February 3, 1956.

in the absence of affirmative proof that there has been a fraud committed, no post-trial harassment of the juror should be permitted. United States ex rel. Daverse v. Hohn, 3 Cir., 1952, 198 F.2d 934, at page 938.

For the reasons stated I would affirm the judgment of the District Court.